IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Cricket Store 17, LLC d/b/a Taboo, | C/A No. 3:13-cv-3557-TLW |
| PLAINTIFF | |
| v. | |
| City of Columbia, | |
| DEFENDANT | |

## Opinion and Order

This action, brought by Cricket Store 17, LLC d/b/a Taboo, alleges First, Fifth, and Fourteenth Amendment violations against the City of Columbia regarding Columbia's sexually oriented business ordinances. Before the Court is Taboo's Motion for Preliminary Injunction. (Doc. #5.) For the reasons stated below, the Court denies Taboo's motion.

## I.    Factual and Procedural History

Taboo is a sexually oriented business located on "highly commercialized United States Highways" in Columbia, South Carolina. (Doc. #5-2 at 2.) After receiving its business license from Columbia, it opened for business on December 5, 2011. (*Id.* at 3.) It has operated continuously at its current location since opening.

> [Taboo] is a small business that provides take home only retail merchandise. It is only 1,600 square feet, and it provides no on-site adult entertainment. There is no theater; there are no mini movies; and there are no live performances. What [Taboo] sells is a mixed inventory of clothing, lotions, candles, vitamins, massage oils, party supplies, batteries, contraceptives, smoking accessories, novelties, gifts, games, and DVDs and magazines.

1

(*Id.* at 4.)

On December 29, 2011, less than one month after Taboo opened, Columbia adopted Ordinance No. 2011-105 ("2011 Ordinance") (Doc. #1-1), which is a comprehensive ordinance regulating sexually oriented businesses in Columbia and which amended its then-existing sexually oriented business ordinance.

The purpose of the 2011 Ordinance is described as follows:

> It is the purpose of this Article to regulate sexually oriented businesses in order to promote the health, safety, and general welfare of the citizens of the City, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses within the City. The provisions of this Article have neither the purpose nor effect of imposing a limitation or restriction on the content or reasonable access to any communicative materials, including sexually oriented materials. Similarly, it is neither the intent nor effect of this Article to restrict or deny access by adults to sexually oriented materials protected by the First Amendment, or to deny access by the distributors and exhibitors of sexually oriented entertainment to their intended market. Neither is it the intent nor effect of this Article to condone or legitimize the distribution of obscene material.

§ 11-601(a). The 2011 Ordinance also contains an extensive findings and rationale section that lists dozens of court opinions and orders, reports from various cities across the country, and several journal articles. § 11-601(b). Based on this information, Columbia made the following findings:

> (1)    Sexually oriented businesses, as a category of commercial uses, are associated with a wide variety of adverse secondary effects including, but not limited to, personal and property crimes, prostitution, potential spread of disease, lewdness, public indecency, obscenity, illicit drug use and drug trafficking, negative impacts on surrounding properties, urban blight, litter, and sexual assault and exploitation. Alcohol consumption impairs judgment and lowers inhibitions, thereby increasing the risk of adverse secondary effects.

> (2)    Sexually oriented businesses should be separated from sensitive land uses to minimize the impact of their secondary effects upon such uses, and should be separated from other sexually oriented businesses, to minimize the secondary effects associated with such uses and to prevent an unnecessary concentration of sexually oriented businesses in one area.

2

(3)    Each of the foregoing negative secondary effects constitutes a harm which the City has a substantial government interest in preventing and/or abating. This substantial government interest in preventing secondary effects, which is the City's rationale for this Article, exists independent of any comparative analysis between sexually oriented and non-sexually oriented businesses. Additionally, the City's interest in regulating sexually oriented businesses extends to preventing future secondary effects of either current or future sexually oriented businesses that may locate in the City. The City finds that the cases and documentation relied on in this Article are reasonably believed to be relevant to said secondary effects.

*Id.* The legislative record consists of almost 2,200 pages.

Among other provisions, the 2011 Ordinance does the following:

- requires a sexually oriented business to hold a sexually oriented business license, § 11-604(a);

- requires each individual employee to hold a sexually oriented business employee license, § 11-604(b);

- provides standards for issuance, suspension, revocation, denial, and transfer of licenses, as well as appeals of licensing decisions, §§ 11-604–11;

- requires the business to be closed between midnight and 6:00 AM, § 11-612;

- restricts the location of the business, § 11-620(a)–(d);

- provides a two-year amortization period for an existing business, in addition to the possibility of a hardship extension, § 11-620(e)–(f);

On November 13, 2012, Columbia adopted Ordinance No. 2012-093 ("2012 Ordinance"). (Doc. #7-7.) The 2012 Ordinance provides substantially the same purpose, findings, and rationale section as the 2011 Ordinance. § 17-371. Significant to Taboo's business, the 2012 Ordinance alters the permissible locations for a sexually oriented business. § 17-374.

Specifically, under the 2012 Ordinance, a sexually oriented business must be located within an M-1 (light industrial) or M-2 (heavy industrial) district. § 17-374(b). Additionally, it must be at least 900 feet from a church, a residential district, an outdoor recreational facility at which minors are likely to congregate, a lot devoted to residential use, a day care facility, or a

cemetery. § 17-374(c). It also must be at least 1,000 feet from another sexually oriented business and at least 1,250 feet from any elementary or secondary school, and it may not be within the same building as another sexually oriented business. § 17-374(d)–(f).

Prior to filing this action, Taboo sought a hardship extension of the amortization period under § 11-620(f). That section provides that an application for a hardship extension "shall include evidence of purchase and improvement costs, income earned and lost, depreciation, and costs of relocation." § 11-620(f). It also provides that "[t]he hardship extension shall be granted only upon a showing that the nonconforming sexually oriented business is unable to recoup its investments, made prior to the effective date of this Article, in its current location unless the hardship extension is granted." *Id.*

Taboo's extension request was denied on November 29, 2013. (Doc. #7-3 at 6.) The independent hearing officer found that Taboo "failed to establish the amount of its investment made prior to December 29, 2011 and it has also failed to establish that it has not reasonably recouped its investment." (*Id.* at 5.) The hearing officer further found that its accounting paperwork "showed significant inaccuracies, rendering the statements of little or no evidentiary value," that "[t]he bank statements are, likewise, insufficient to show Taboo's investment prior to December 29, 2011 or the amount of investment recouped in that [Taboo's owner] comingled business and personal use of this account," and that "no evidence was presented regarding income and expenses for 2013, which, at the time of [the] hearing, represented an additional 10½ months for Taboo to recoup its investment." (*Id.* at 5–6.) Accordingly, the hearing officer denied the extension request. (*Id.* at 6.)

On December 20, 2013, Taboo filed this action seeking monetary damages, injunctive relief, a declaration that the 2011 and 2012 Ordinances are unconstitutional (both facially and as-

applied), and attorneys' fees. (Doc. #1 at 11–12.) At the same time, Taboo filed its Motion for

Preliminary Injunction, requesting a "temporary restraining order/preliminary injunction" that

would prohibit Columbia from taking any action to close the store upon the expiration of its 2013

business license on December 31, 2013, require Columbia to renew Taboo's 2014 business

license, and prohibit the use of law enforcement to close the store until the Court has made a

final ruling on the case. (Doc. #5.) On December 30, 2013, Columbia filed a response in

opposition, asking the Court to deny Taboo's motion. (Doc. #7.) Also on December 30, 2013,

the Court held a telephone conference with the parties' counsel and scheduled a hearing on the

motion. On January 3, 2014, Taboo filed a reply in support of its motion. (Doc. #12.) A hearing

was held on January 10, 2014, at which the parties presented their legal arguments, offered the

live testimony of Taboo's owner and the director of Columbia's Planning and Development

Services Department, and entered evidence into the record.

The director of Columbia's Planning and Development Services Department testified at

the hearing that, as of January 8, 2014, there are 45 parcels in the city, with a combined acreage

of about 140 acres, that are available for use by a sexually oriented business. An exhibit listing

these parcels, including their tax map numbers, addresses, and acreage, was admitted into

evidence.

Taboo's owner testified regarding his familial and educational background, his prior

involvement in the ownership of adult businesses, and his operation of Taboo. He also discussed

the process of finding the current location of the store, the permitting process, and his

renovations of the building. He also testified that there have not been any arrests for crimes that

occurred on the premises, that there have not been any complaints to him, that the police have

not been called for any criminal activity on the premises, and that business was booming in the

area. He further discussed his research into the parcels that were described by Columbia as being available for use by a sexually oriented business. He testified that he visited each of these sites[1] and that only a few had signs indicating that they were for sale or lease. Additionally, he questioned whether four of them were, in fact, available for use by a sexually oriented business, as they may have been too close to one or more of the protected uses listed in § 17-374.

## II.    Standard of Review

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Such relief is "never awarded as of right." *Id.* at 24. The standard for granting a temporary restraining order or a preliminary injunction is the same. *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006).

A party seeking a temporary restraining order or a preliminary injunction must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. Each of these factors must be separately considered and "satisfied as articulated." *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, *Citizens United v. FEC*, 558 U.S. 310 (2010), *aff'd*, *The Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010) (per curiam).

---

[1] Taboo entered into evidence photos of him standing in front of each of the parcels, demonstrating that he had, in fact, visited them.

## III.    Discussion

For the reasons discussed below, the Court concludes that (1) Taboo is not likely to succeed on the merits; (2) Taboo is not likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities does not tip in Taboo's favor; and (4) an injunction is not in the public interest.  Because the Court concludes that Taboo has not established all of the *Winter* factors, it is not entitled to a preliminary injunction.

### A.     Likelihood of Success on the Merits

Taboo makes both a facial and an as-applied challenge to the ordinances.  However, the analysis for both is the same.  *See Independence News, Inc. v. City of Charlotte*, 568 F.3d 148, 155 n.3 (4th Cir. 2009).  Taboo also raises Fifth and Fourteenth Amendment equal protection and due process arguments, in addition to its First Amendment arguments.  However, because Taboo cannot prevail on the due process and equal protection arguments if it is unsuccessful on the First Amendment arguments, the Court will begin with the First Amendment analysis.  *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 55 n.4 (1986) (holding that because the ordinance complied with the First Amendment, the respondents "can fare no better under the Equal Protection Clause"); *Deja Vu-Everett-Federal Way, Inc. v. City of Federal Way*, 46 F. App'x 409, 411 (9th Cir. 2002) (holding that because the city's sexually oriented business regulations complied with the First Amendment, they were not irrational or arbitrary action in violation of substantive due process).

The analysis of sexually oriented business legislation consists of three steps.  *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002) (plurality) (describing *Renton*'s

three-step analysis).  The first step is determining whether the regulation bans sexually oriented businesses outright or instead only restricts when and where they may operate, in which case it is analyzed as a time, place, and manner regulation.  *See Independence News*, 568 F.3d at 154 (citing *Renton*, 475 U.S. at 46).  The second step is determining whether the ordinance is content-neutral or content-based.  *See id.* (citing *Renton*, 475 U.S. at 47–49).  If the ordinance is a content-neutral time, place, and manner regulation, then the ordinance is subject to intermediate scrutiny.  *Imaginary Images v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010).  In that case, the third step is determining whether the regulation is designed to serve a substantial government interest, whether it is narrowly tailored to achieve that interest, and whether it unreasonably limits alternative avenues of communication.  *See Independence News*, 568 F.3d at 154 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989); *Renton*, 475 U.S. at 47).  The Court will address each of these steps.

### 1.    *Time, place, and manner regulation*

Columbia's ordinances are time, place, and manner regulations.  An ordinance that does not ban sexually oriented businesses outright, and instead only restricts when and where they operate, is analyzed as a time, place, and manner regulation.  *See id.* (citing *Renton*, 475 U.S. at 46).  Here, Columbia's ordinances do not ban sexually oriented businesses outright.  *See* § 11-601(a) (providing that the ordinance has "neither the purpose nor effect of imposing a limitation or restriction on the content or reasonable access to any communicative materials, including sexually oriented materials"); § 17-371 (same).  Rather, like the ordinances in *Renton* and *Independence News*, Columbia's ordinances primarily seek to regulate the areas where a sexually oriented business may locate.  *See Renton*, 475 U.S. at 44–45 (prohibiting adult movie

theaters from locating within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school); *Independence News*, 568 F.3d at 151 (prohibiting sexually oriented businesses from locating within various distances from various property uses). Because Columbia's ordinances are not an outright ban on sexually oriented businesses, they are properly analyzed as time, place, and manner regulations.

Taboo objects to the 2011 Ordinance's requirement that sexually oriented businesses close from midnight to 6:00 AM. It argues that, under *Renton*, a government entity may not restrict the time that a sexually oriented business may operate. However, the ordinance analyzed in *Renton* was only a location restriction; there was no time restriction at issue. Furthermore, time restrictions much more severe than Columbia's have been held to be constitutional. *See, e.g.*, *Mitchell v. Comm'n on Adult Entm't Establishments*, 10 F.3d 123, 139 (3d Cir. 1993) (upholding an ordinance requiring sexually oriented businesses to be closed from 10:00 PM to 10:00 AM, Monday through Saturday, and requiring them to be closed all day on Sundays and holidays).

Taboo also argues that the ordinances constitute unconstitutional prior restraints on speech in violation of the First Amendment. A licensing ordinance for sexually oriented businesses is not an unconstitutional prior restraint as long as it (1) avoids unbridled discretion in the licensing decision maker; (2) places limits on the time within which the decision maker must issue the license; and (3) provides for prompt judicial review of an adverse decision. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225–28 (1990).

Columbia's ordinances meet that standard. Columbia may deny a license based only on "reasonably objective, nondiscretionary criteria unrelated to the content of the expressive materials," *City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 783 (2004), including whether

the applicant is underage, has submitted false information, or has been convicted of certain crimes within the past five years.  *See* § 11-605(a).  Thus, the ordinances present no concern of "unbridled discretion."  The ordinances also place limits on the time within which the decision maker must act on an application by requiring the license to be issued or denied within 20 days after application.  *Id.*  Finally, the ordinances provide for prompt judicial review by providing that, if the applicant appeals to a hearing officer and the hearing officer denies the license, the applicant may appeal the decision to a court of competent decision and that the hearing officer's decision does not become effective until the 30th day after it is rendered.  § 11-610(a). Furthermore, the ordinances provide that if any court action is initiated to appeal, challenge, restrain, or otherwise enjoin the city's enforcement of any license denial, suspension, or revocation of a license, the city is required to issue the applicant a provisional license that allows the applicant to operate until the court issues a judgment on the matter.  § 11-610(b).  For these reasons, the Court concludes that Columbia's ordinances do not operate as unconstitutional prior restraints.

## 2.    *Content-based or content-neutral*

Having determined that Columbia's ordinances are time, place, and manner regulations, the next step is to determine whether they are content-based or content-neutral.  An ordinance that is aimed at the negative secondary effects of sexually oriented businesses, not the content of the speech, is content-neutral.  *Independence News*, 568 F.3d at 154 (citing *Renton*, 475 U.S. at 47–49).  When enacting legislation based on secondary effects, a city

> is entitled to "rely heavily on the experience of, and studies produced by, other cities and states, as well as on court opinions from other jurisdictions," *Mitchell*, 10 F.3d at 133, and need not, before enacting such ordinances, "conduct new

studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Renton*, 475 U.S. at 51–52.

*Independence News*, 568 F.3d at 155.

Columbia's ordinances are explicit in targeting the secondary effects of the speech, not the speech itself. *See* § 11-601(a) ("It is the purpose of this Article to regulate sexually oriented businesses in order to promote the health, safety, and general welfare of the citizens of Columbia, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses within Columbia. The provisions of this Article have neither the purpose nor effect of imposing a limitation or restriction on the content or reasonable access to any communicative materials, including sexually oriented materials."); § 17-371 (same).

Taboo argues that the ordinances are content-based and therefore subject to strict scrutiny. It primarily bases this argument on the timing of the 2011 Ordinance's enactment and on statements made by one of the members of City Council.

Regarding the timing of the 2011 Ordinance's enactment, Taboo argues that animus may be found because the 2011 Ordinance was enacted less than one month after Taboo opened its doors. However, the fact that Taboo's opening spurred Columbia into action is not relevant, as this does not demonstrate that a ban on Taboo's erotic message[2] was a motive for the ordinances.

_____

[2] It is not clear that the entirety of Taboo's erotic message is protected by the Constitution, as Columbia argues that the sale of sexual devices is not a constitutionally-protected right. The Court notes that there is a circuit split on the issue of whether an outright ban on the sale of sexual devices is constitutional. *Compare Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 744 (5th Cir. 2008) (holding that a Texas ban on the sale of sexual devices was unconstitutional under the Fourteenth Amendment), *with Williams v. Morgan*, 478 F.3d 1316, 1323 (11th Cir. 2007) (holding that an Alabama ban on the sale of sexual devices was constitutional under the Fourteenth Amendment). The Fourth Circuit has not yet weighed in on this debate. For purposes of deciding this motion, it is not necessary for the Court to specifically determine whether the Constitution protects the sale of sexual devices. However, the case law holding that

11

*See D.G. Restaurant Corp. v. City of Myrtle Beach*, 953 F.2d 140, 146 (4th Cir. 1991).

Regarding the alleged statements of one of the members of City Council, those statements are both innocuous and irrelevant to the analysis of the issues in this case. Taboo references a newspaper article, which quotes one of the council members as saying, "I just don't think [sexually oriented businesses] belong on major thoroughfares," and that Columbia needs to "[g]et professionals to tell us where does it belong." (Doc. #14-3 at 2.) Contrary to Taboo's assertions, these statements do not necessarily reflect a desire by the council member to ban Taboo's message and, instead, arguably are a recognition that Columbia cannot enact an outright ban, but that it may regulate the location of sexually oriented businesses. Furthermore, even if these statements could be construed as this council member's desire to ban businesses like Taboo's, it is well-established that courts will not strike down otherwise constitutional legislation based on alleged improper legislative motives or statements. *Renton*, 475 U.S. at 47–48 (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)); *see also D.G. Restaurants*, 953 F.2d at 146 ("[T]he individual motives of legislators, even if those motives are demonstrated to conflict with the expressed purpose of the enacted legislation, are rarely relevant to a court's consideration of the legitimacy of the legislation.").

Taboo also argues that this Court should rely on the Eleventh Circuit's ruling in *Flanigan's Enterprises, Inc. of Georgia v. Fulton County*, 242 F.3d 976 (11th Cir. 2001), in which that court determined that a county's ordinance prohibiting the sale of alcoholic beverages in adult establishments was unconstitutional. However, that case is clearly distinguishable from Taboo's case.

In *Flanigan's*, the county conducted its own study on the secondary effects of adult

---

a ban on sexual devices does not violate the Constitution is persuasive.

entertainment establishments that served alcohol, which showed no increase in crime at such establishments, and, in fact, showed increased calls for service and crime at non-adult entertainment establishments. *Flanigan's*, 242 F.3d at 979. Additionally, some of the adult establishments conducted their own study, which showed no negative economic impact caused by the clubs, and another study from the county showed the same. *See id.* at 979–80. Despite these local studies showing a lack of negative secondary effects, the county, relying on various foreign studies, passed the ordinance. *Id.* at 980–81. The Eleventh Circuit recognized that a government entity need not conduct its own studies, but, "having done so, the [county] cannot ignore the results." *Id.* at 986. The court found that "it was unreasonable for [the county] to rely on remote, foreign studies concerning secondary effects when the county's own current, empirical data conclusively demonstrated that such studies were not relevant to local conditions." *Id.*

The holding in *Flanigan's* is not applicable to this case because there is no evidence that Columbia conducted its own studies prior to enacting the ordinances. Instead, Columbia relied on dozens of court opinions and orders, reports from various cities across the country, and several journal articles as evidence that sexually oriented businesses have certain negative secondary effects. § 11-601(b); § 17-371. This approach is constitutionally permissible and has been approved by both the Supreme Court and the Fourth Circuit. *See, e.g.*, *Alameda Books*, 535 U.S. at 438; *Renton*, 475 U.S. at 51–52; *Imaginary Images*, 612 F.3d at 745; *Independence News*, 568 F.3d at 155. Because Columbia's evidentiary basis for the ordinances was "reasonably believed to be relevant to the [secondary effects] problem that the city addresses," the ordinances are content-neutral. *Renton*, 475 U.S. at 51–52.

Finally, Taboo argues that there have been no negative secondary effects at its location

and points to much new development nearby.  It also notes that its building was in a dilapidated condition with vagrants living inside prior to Taboo's renovations.  Columbia does not strenuously contest these points, asserting that they are not relevant.  The Court agrees with Columbia.  While Taboo may well have operated without significant secondary effects during its two-year existence,[3] this does not affect the constitutional analysis.

*Independence News* is instructive.  There, the City of Charlotte passed an ordinance similar to Columbia's, and the ordinance included an amortization period.  *See Independence News*, 568 F.3d at 151.  Shortly before the end of the amortization period, two sexually oriented business challenged the constitutionality of the ordinance and made substantially the same arguments that Taboo makes—property values had held steady or increased, no sex-related crimes had occurred in the area, crime in general had not increased, a number of businesses had located nearby, and residential construction was taking place.  *See id.* at 152–53.  The businesses argued that the ordinance was unconstitutional as-applied to their establishments because the theoretical justification for the ordinance was not borne out by the data gathered after passage.  *See id.* at 155.  However, the Fourth Circuit held that Charlotte did not have to show that a particular establishment generated secondary effects in order to enforce the ordinance against it.  *Id.* at 156.  The only question was "whether the City had a sufficient evidentiary basis for adopting the ordinance . . . ."  *Id.*

That analysis directly applies to this case.  Columbia is not required to show that Taboo has actually generated negative secondary effects in order to enforce the ordinances against it.  *Id.*  The fact that Taboo may not have generated negative secondary effects is not relevant to the constitutional question.  *Id.*  Instead, the primary question under the *Renton* analysis is whether,

---

[3] Columbia offered testimony that a next-door business constructed a privacy fence to shield the view of Taboo's store after receiving customer complaints.

in enacting the ordinance, Columbia relied on evidence reasonably believed to be relevant to the problem of negative secondary effects. *Id.* As discussed, Columbia did so, and the ordinances are therefore content-neutral.

To counter this argument, Taboo relies on *Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) for the proposition that Columbia must show negative secondary effects as a result of Taboo's operation. This argument is not persuasive. In *Legend*, the court was faced with the question of whether a Maryland statute prohibiting the sale of alcohol at establishments that presented entertainment involving nudity or simulated sexual behavior was overbroad. *Legend*, 637 F.3d at 295–96. The court found that the statute was invalid because it "impose[d] restrictions that extend[ed] well beyond strip clubs and other establishments primarily offering adult entertainment," and was broad enough to cover many productions with clear artistic merit, including ballets and Shakespearean plays. *Id.* at 299–300.

Taboo focuses on *Legend*'s quoting of the district court's finding that "[the government] ha[d] not produced evidence of harmful secondary effects in Prince George's County, Maryland." *Id.* at 299. Taboo reads this single sentence, which is accompanied by no further discussion or citation to authority, to eviscerate one of *Renton*'s primary holdings—that a government may rely on information from elsewhere without undertaking its own local studies. *See Renton*, 475 U.S. at 51–52 ("The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses."). Thus, Taboo argues, "Columbia cannot rely on theoretical negative secondary effects from distant places without showing that negative secondary effects from [Taboo's] operation exist." (Doc. #12 at 10.) This Court is not

15

convinced.

First, *Legend* was an overbreadth case, and this is not. Second, there is no basis to conclude that the Fourth Circuit intended to ignore or reason around a Supreme Court holding. Third, Taboo fails to address the very next sentence of the district court's opinion: "The absence of such evidence [of harmful secondary effects in the county] would not pose Constitutional problems if the Legislation were sufficiently narrowly tailored." *Legend Night Club v. Prince George's County Bd. of License Comm'rs*, Nos. MJG-05-2138, MJG-05-2686, 2009 WL 926989, at *2 (D. Md. Apr. 1, 2009). As discussed below, the Court finds that Columbia's ordinances are narrowly tailored. Thus, any weight given to the single sentence Taboo cites does not change the outcome in this case.

Accordingly, because the Court finds that the ordinances are content-neutral time, place, and manner restrictions, they are subject to intermediate scrutiny. *Imaginary Images*, 612 F.3d at 742.

3.      ***Substantial government interest, narrowly tailored, and alternative avenues of communication***

For regulations subject to intermediate scrutiny, the third step of the *Renton* analysis is comprised of three separate requirements: (1) the regulations must be designed to serve a substantial government interest; (2) they must be narrowly tailored to achieve that interest; and (3) they must not unreasonably limit alternative avenues of communication. *See Independence News*, 568 F.3d at 154 (citing *Ward*, 491 U.S. at 798; *Renton*, 475 U.S. at 47).

a.    *Substantial government interest*

It is well-established that attempting to preserve the quality of urban life and prevent negative secondary effects from sexually oriented businesses are substantial government interests.  *See, e.g.*, *Alameda Books*, 535 U.S. at 435; *Renton*, 475 U.S. at 50; *Imaginary Images*, 612 F.3d at 747.  Because these are the interests Columbia seeks to protect with its ordinances, the Court finds that the ordinances are designed to serve a substantial government interest.  *See* § 11-601(a) ("It is the purpose of this Article to regulate sexually oriented businesses in order to promote the health, safety, and general welfare of the citizens of the City, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses within the City."); § 17-371 (same).

b.    *Narrowly tailored*

Having determined that the ordinances are designed to serve Columbia's substantial government interests, the next step is to determine whether the ordinances are narrowly tailored to serve those interests.  "[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  *Ward*, 491 U.S. at 799.  "[I]t need not be the least restrictive or least intrusive means of doing so."  *Id.* at 798.  "[T]he validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case."  *Id.* at 801.  "[T]he regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."  *Id.* at 800; *see also Alameda*

*Books*, 535 U.S. at 451–52 (Kennedy, J., concurring) ("The Los Angeles City Council knows the streets of Los Angeles better than we do.  It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion.").

Taboo argues that its business is different than the movie theaters and strip clubs in cases such as *Renton* and *D.G. Restaurants* because it is a retail-only store—there is no live entertainment on the premises.  Thus, Taboo argues that the cases discussing negative secondary effects do not apply to its store.  However, the Court concludes that the distinction Taboo attempts to make is neither significant nor sufficiently persuasive in light of the case law.

Under *Renton* and its progeny, the government need only rely on evidence that is "reasonably believed to be relevant to the problem that the [government] addresses." *Renton*, 475 U.S. at 51–52; *accord Alameda Books*, 535 U.S. at 437 (plurality); *id.* at 451 (Kennedy, J., concurring).  Columbia argues that under this standard, it did not need to rely on evidence specific to retail-only stores.  While the Court agrees with this position, the Court notes that Columbia also has a strong fallback position—that it did, in fact, rely on evidence about negative secondary effects arising from retail-only stores in enacting the ordinances.  The legislative record contains several cases detailing negative secondary effects from retail-only stores, including *H&A Land Corp. v. City of Kennedale*, 480 F.3d 336 (5th Cir. 2007) and *World Wide Video of Washington, Inc. v. City of Spokane*, 368 F.3d 1186 (9th Cir. 2004).[5]  The Constitution does not require more.  Because Columbia's interests "would be achieved less effectively absent the regulation," the Court finds that Columbia's ordinances are narrowly tailored.  *Ward*, 491 U.S. at 799.

---

[5] Columbia's legislative record also includes all of the documentary evidence on negative secondary effects that Spokane relied on in enacting its ordinances.

c.    *Alternative avenues of communication*

Finally, having determined that the ordinances are narrowly tailored to achieve Columbia's substantial interests, the final step in the *Renton* analysis is to determine whether the ordinances unreasonably limit alternative avenues of communication.    Under this test, Columbia's ordinances must not deny sexually oriented businesses a reasonable opportunity to open and operate in the city.  *Renton*, 475 U.S. at 54.  There is no mathematical formula used to determine whether there are sufficient alternative avenues of communication.  However, there are some general rules that can be gleaned from case law.

The fact that land available for use by a sexually oriented business may already be occupied, not for sale, or not commercially viable is irrelevant to the question of whether alternative locations are available.  *See Renton*, 475 U.S. at 53–54; *see also David Vincent, Inc. v. Broward County*, 200 F.3d 1325, 1334 (11th Cir. 2000) ("[T]he First Amendment is not concerned with restraints that are not imposed by the government itself or the physical characteristics of the sites designated for adult use by the zoning ordinance.  It is of no import under *Renton* that the real estate market may be tight and sites currently unavailable for sale or lease, or that property owners may be reluctant to sell to an adult venue.").  While relocating may be difficult for Taboo, the case law is clear that Columbia is not constitutionally obligated to provide commercially desirable land.  *See, e.g.*, *Renton*, 475 U.S. at 54 ("That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation."); *D.G. Restaurants*, 953 F.2d at 147 (restricting strip clubs to "a few poorly lit sites in industrial areas, far from the tourist-oriented businesses" did not violate the Constitution).    Additionally, the economic feasibility of relocating is not a First Amendment concern.  *David Vincent*, 200 F.3d at 1334.

19

At the preliminary injunction hearing, Columbia's witness testified that there are 45 parcels available in Columbia for use by a sexually oriented business, with a total acreage of about 140 acres. Testimony from Taboo's owner called into question the availability of four of these parcels based on their proximity to various protected uses described in the ordinances. Based on the evidence listing the acreage of each parcel, it appears that the total acreage for these four parcels is about 18 acres. However, for purposes of this motion, it is not necessary for the Court to precisely decide how much land is available. It is sufficient for the Court to conclude that, based on the evidence presented at the hearing, between 41 and 45 parcels, with a combined acreage of roughly 122 to 140 acres, are available for use by a sexually oriented business in Columbia under the restrictions imposed by the ordinances.

The Court notes that the available land in this case is significantly less than what has been approved in some other cases. *See, e.g.*, *Renton*, 475 U.S. at 53 (520 acres or more than 5% of the total land area of the city); *Ambassador Books v. City of Little Rock*, 20 F.3d 858, 864 (8th Cir. 1994) (97 sites or 6.75% of the total land area of the city).[6] However, this is a distinction without constitutional significance, as the testimony at the hearing was that Taboo is the only sexually oriented business seeking to locate in Columbia.

Taboo relies on a case from the Southern District of Florida in which the court found Miami-Dade County's ordinance unconstitutional because it unreasonably limited alternative avenues of communication. *University Books & Videos, Inc. v. Miami-Dade County*, 132 F. Supp. 2d 1008, 1013–18 (S.D. Fla. 2001). However, that case is distinguishable from the instant case because there, 39 sexually oriented businesses were operating in the county prior to the

---

[6] At the hearing, there was no evidence presented on the total land area of Columbia, so the Court makes no finding on the percentage of Columbia's land available for use by a sexually oriented business.

ordinance's passage, but after the ordinance's passage, only 10 to 12 sexually oriented businesses could operate in the county because of the distance and location restrictions. *Id.* at 1015. Thus, the court noted that "the ordinance would necessarily reduce the proven market for adult fare by at least two-thirds." *Id.* By contrast, Taboo is the only sexually oriented business currently operating in Columbia, and the only testimony in the record is that no other sexually oriented businesses are seeking to operate in the city. Thus, this Court cannot say that restricting sexually oriented businesses to the 41 to 45 parcels that are available in Columbia would have the same or similar reduction of speech that resulted from the ordinance in *University Books*.

Taboo also vehemently objects to the 2011 Ordinance's provision restricting sexually oriented businesses to providing only one particular classification of adult material or entertainment at a single location (i.e. a sexually oriented business cannot sell sexual devices and DVDs at the same location). *See* § 11-617(f) ("No person shall operate more than one sexually oriented business or classification of sexually oriented business in a single building or structure."). Taboo asserts that this is "the most restrictive ordinance in the history of municipal law," (Doc. #5-1 at 8), that it is "unlike anything in the annals of First Amendment litigation," (Doc. #12 at 6), and likens it to "telling a hardware store it can sell hammers but no nails." (*Id.* at 5). Taboo argues that this restriction effectively makes it impossible for a sexually oriented business to operate in Columbia and is therefore unconstitutional. However, similar restrictions have been approved by both the Supreme Court and the Fourth Circuit.

The Court in *Alameda Books* was presented with such a restriction, which prohibited "the establishment or maintenance of more than one adult entertainment business in the same building, structure or portion thereof." *Alameda Books*, 535 U.S. at 431. The plaintiffs in that case operated an adult bookstore and an adult video arcade within the same building. *Id.* at 429.

The Court held that the city could infer that reducing the concentration of adult operations in a neighborhood, whether within separate establishments or in one larger establishment, will reduce negative secondary effects.  *See id.* at 436 (plurality opinion); *id.* at 450–53 (Kennedy, J., concurring).  The Fourth Circuit, in both pre- and post-*Renton* decisions, has come to the same conclusion regarding similar provisions.  *See Independence News*, 568 F.3d at 151; *Hart Book Stores, Inc. v. Edmisten*, 612 F.2d 821, 826–27 (4th Cir. 1979).  Though complying with this restriction may be financially difficult for Taboo, in determining whether Columbia has unreasonably limited alternative avenues of communication, "commercial viability is not an appropriate consideration."  *David Vincent*, 200 F.3d at 1334.

In addition, Taboo objects to the two-year amortization period in the ordinance.  This argument lacks sufficient merit.  There is no constitutional requirement for a grandfathering provision, *David Vincent*, 200 F.3d at 1332, and courts have regularly approved similar (or even shorter) amortization periods.  *See, e.g.*, *World Wide Video*, 368 F.3d at 1199–1200 (one year); *Ambassador Books*, 20 F.3d at 865 (three years); *Hart Book Stores*, 612 F.2d at 830 (six months).

In a similar argument, Taboo claims that the ordinances are barred as *ex post facto* laws.  The Court disagrees.  There are four types of *ex post facto* laws:  (1) "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action"; (2) "[e]very law that aggravates a crime, or makes it greater than it was, when committed"; (3) "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed"; and (4) "[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender."  *Calder v. Bull*, 3

U.S. 386, 390 (1798) (emphasis omitted); *see also Carmell v. Texas*, 529 U.S. 513, 522 (2000) (following *Calder*). None of these circumstances apply to Columbia's ordinances. The ordinances do not punish action that was taken prior to the passage of the ordinances, which is the essence of an *ex post facto* law. Rather, the ordinances restrict and penalize action that takes place after the passage of the ordinances (and after the amortization period has run). Taboo's initial opening and operation was not a violation because it complied with the then-existing ordinances. It is Taboo's *continued* operation at its present location that runs afoul of the current ordinances. Because the ordinances do not punish action that was taken prior to the enactment of the ordinances, the Court concludes that there is no *ex post facto* violation.

        Finally, Taboo objects to the hardship extension procedure, arguing that it is

> an example of the type of unbridled discretion condemned by the Supreme Court in *FW/PBS Inc. v. City of Dallas*, 493 U.S. 215 [] (1990) because it provides no objective criteria to determine the hardship or provide for any prompt judicial review. The decision whether to grant or withhold a hardship discretion [sic] is in the sole discretion of the hearing officer.

(Doc. #12 at 8.)

        To the contrary, the hardship extension procedure does provide objective criteria upon which the hearing officer's decision must be based. The ordinance provides that the extension shall be granted if the applicant demonstrates "that the nonconforming sexually oriented business is unable to recoup its investments, made prior to the effective date of this Article, in its current location unless the hardship extension is granted." § 11-620(f). The ordinance also requires that the application include "evidence of purchase and improvement costs, income earned and lost, depreciation, and costs of relocation." *Id.* The ordinance provides the standard by which the hearing officer must decide the application, and it lists evidence that the hearing officer must consider. The Court concludes that this is sufficiently objective and is not an example of unbridled discretion.

Regarding judicial review, Taboo is correct that § 11-620(f) does not specifically discuss the procedure for seeking judicial review from the denial of the hardship extension application. However, whether to grant the hardship extension is a licensing decision, and judicial review for all licensing decisions is covered in § 11-610(a).    Thus, the hardship extension procedure provides for prompt judicial review.

For the reasons stated, the Court concludes that Taboo is not likely to succeed on the merits of its claims.

### B.    Irreparable Harm

"[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim."  *Tepeyac v. Montgomery County*, 722 F.3d 184, 190 (4th Cir. 2012) (citation omitted); *see also Phelps–Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps–Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) ("In a First Amendment case, [] the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue.").   It is undeniable that Taboo will suffer irreparable harm if its First Amendment freedoms are lost.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  However, if Taboo is not likely to succeed on the merits of its claims, it is also not likely to suffer irreparable harm because no First Amendment freedoms will be lost.  Because the  Court concludes that Taboo is not likely to succeed on the merits, the Court concludes that Taboo is not likely to suffer irreparable harm in the absence of preliminary relief.   While complying with the ordinances may have adverse

consequences for Taboo, the law provides no relief.

### C.    Balance of Equities

Like the irreparable harm analysis, the balance of equities analysis is also "inseparably linked" to the resolution of the likelihood of success question.  *Tepeyac*, 722 F.3d at 191.  It is certainly true that "a [government entity] is in no way harmed by issuance of a preliminary injunction which prevents the [government entity] from enforcing restrictions likely to be found unconstitutional.  If anything, the system is improved by such an injunction." *Id.*  However, it is equally true that Taboo will not be harmed in a constitutional sense, which is the extent of the reach of this Court, by the enforcement of an ordinance that is likely to be found constitutional. Accordingly, because Taboo is not likely to succeed on the merits of its claims, the Court concludes that the balance of equities does not tip in Taboo's favor.

### D.    Public Interest

Similarly, determining whether an injunction is in the public interest is also closely tied to whether the plaintiff is likely to succeed on the merits.  *See Pashby v. Delia*, 709 F.3d 307, 330 (4th Cir. 2013) (holding that likelihood of success on the merits satisfies the public interest prong if other considerations do not meaningfully weigh on that factor).  The public, of course, has a strong interest in seeing that constitutional legislation is upheld.  On the other hand, protecting First Amendment liberties is also in the public interest.  *See Legend*, 637 F.3d at 303. The Court concludes that an injunction would not be in the public interest, as Taboo is not likely to succeed on the merits of it claims.

## IV.    Conclusion

Federal courts do not sit as "super-legislature[s]" to judge the desirability of legislative enactments. *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).  Disputes regarding controversial, but constitutional, legislation must be resolved at the ballot box, not the courthouse.  *See Vance v. Bradley*, 440 U.S. 93, 97 (1979).  The only question for the Court to decide in this case is whether Columbia's ordinances violate the Constitution.

After careful consideration, the Court concludes that Taboo has not established all of the *Winter* factors and is therefore not entitled to injunctive relief.  Accordingly, Taboo's Motion for Preliminary Injunction (Doc. #5) is **DENIED**.

**IT IS SO ORDERED**.

*s/ Terry L. Wooten*
Terry L. Wooten
Chief United States District Judge

February 10, 2014
Columbia, South Carolina