IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Cricket Store 17, LLC d/b/a Taboo, | Case No. 3:13-cv-3557-TLW |
| PLAINTIFF | |
| v. | **Order** |
| City of Columbia, | |
| DEFENDANT | |

This action, brought by Cricket Store 17, LLC d/b/a Taboo, alleges First, Fifth, and Fourteenth Amendment violations against the City of Columbia regarding the City's sexually oriented business ordinances.  Before the Court are the City's Motion for Summary Judgment, ECF No. 25, and Taboo's Motion for Summary Judgment, ECF No. 38.  The Court grants the City's motion and denies Taboo's motion.

## I.    Factual and Procedural History

Taboo is a sexually oriented business located on "highly commercialized United States Highways" in Columbia, South Carolina.  ECF No. 5-2 at 2.  After receiving its business license from the City, it opened for business on December 5, 2011.  *Id.* at 3.  It has operated continuously at its current location since opening.

> [Taboo] is a small business that provides take home only retail merchandise.  It is only 1,600 square feet, and it provides no on-site adult entertainment.  There is no theater; there are no mini movies; and there are no live performances.  What [Taboo] sells is a mixed inventory of clothing, lotions, candles, vitamins, massage oils, party supplies, batteries, contraceptives, smoking accessories, novelties, gifts, games, and DVDs and magazines.

*Id.* at 4.

1

On December 29, 2011, less than one month after Taboo opened, the City adopted Ordinance No. 2011-105 ("2011 Ordinance"), ECF No. 1-1, which is a comprehensive ordinance regulating sexually oriented businesses in the City and which amended its then-existing sexually oriented business ordinance.

The purpose of the 2011 Ordinance is described as follows:

> It is the purpose of this Article to regulate sexually oriented businesses in order to promote the health, safety, and general welfare of the citizens of the City, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses within the City. The provisions of this Article have neither the purpose nor effect of imposing a limitation or restriction on the content or reasonable access to any communicative materials, including sexually oriented materials. Similarly, it is neither the intent nor effect of this Article to restrict or deny access by adults to sexually oriented materials protected by the First Amendment, or to deny access by the distributors and exhibitors of sexually oriented entertainment to their intended market. Neither is it the intent nor effect of this Article to condone or legitimize the distribution of obscene material.

Columbia, S.C., Code § 11-601(a) (2015). The 2011 Ordinance also contains an extensive findings and rationale section that lists dozens of court opinions and orders, reports from various cities across the country, and several journal articles. *Id.* § 11-601(b). Based on this information, the City made the following findings:

> (1)    Sexually oriented businesses, as a category of commercial uses, are associated with a wide variety of adverse secondary effects including, but not limited to, personal and property crimes, prostitution, potential spread of disease, lewdness, public indecency, obscenity, illicit drug use and drug trafficking, negative impacts on surrounding properties, urban blight, litter, and sexual assault and exploitation. Alcohol consumption impairs judgment and lowers inhibitions, thereby increasing the risk of adverse secondary effects.

> (2)    Sexually oriented businesses should be separated from sensitive land uses to minimize the impact of their secondary effects upon such uses, and should be separated from other sexually oriented businesses, to minimize the secondary effects associated with such uses and to prevent an unnecessary concentration of sexually oriented businesses in one area.

> (3)    Each of the foregoing negative secondary effects constitutes a harm which

2

> the City has a substantial government interest in preventing and/or abating. This substantial government interest in preventing secondary effects, which is the City's rationale for this Article, exists independent of any comparative analysis between sexually oriented and non-sexually oriented businesses. Additionally, the City's interest in regulating sexually oriented businesses extends to preventing future secondary effects of either current or future sexually oriented businesses that may locate in the City. The City finds that the cases and documentation relied on in this Article are reasonably believed to be relevant to said secondary effects.

*Id.* The legislative record consists of almost 2,200 pages.

Among other provisions, the 2011 Ordinance does the following:

- requires a sexually oriented business to hold a sexually oriented business license, *id.* § 11-604(a);

- requires each individual employee to hold a sexually oriented business employee license, *id.* § 11-604(b);

- provides standards for issuance, suspension, revocation, denial, and transfer of licenses, as well as appeals of licensing decisions, *id.* §§ 11-604–11;

- requires the business to be closed between midnight and 6:00 AM, *id.* § 11-612;

- restricts the location of the business, *id.* § 11-620(a)–(d); and

- provides a two-year amortization period for an existing business, in addition to the possibility of a hardship extension, *id.* § 11-620(e)–(f).

On November 13, 2012, the City adopted Ordinance No. 2012-093 ("2012 Ordinance"). ECF No. 7-7. The 2012 Ordinance provides substantially the same purpose, findings, and rationale section as the 2011 Ordinance. Columbia, S.C., Code § 17-371 (2015). Additionally, and relevant to this action, it alters the permissible locations for a sexually oriented business. *Id.* § 17-374. Its adoption requires Taboo to move from its current location.

Under the 2012 Ordinance, a sexually oriented business must be located within an M-1 (light industrial) or M-2 (heavy industrial) district. *Id.* § 17-374(b). Additionally, it must be at least 900 feet from a church, a residential district, an outdoor recreational facility at which

minors are likely to congregate, a lot devoted to residential use, a day care facility, or a cemetery. *Id.* § 17-374(c). It also must be at least 1,000 feet from another sexually oriented business and at least 1,250 feet from any elementary or secondary school, and it may not be within the same building as another sexually oriented business. *Id.* § 17-374(d)–(f). The distance buffer is measured from the nearest portion of the building used by the sexually oriented business, not the property line of the parcel on which it is located. *Id.* § 17-374(g).

Prior to filing this action, Taboo sought a hardship extension of the amortization period under § 11-620(f). That section provides that an application for a hardship extension "shall include evidence of purchase and improvement costs, income earned and lost, depreciation, and costs of relocation." *Id.* § 11-620(f). It also provides that "[t]he hardship extension shall be granted only upon a showing that the nonconforming sexually oriented business is unable to recoup its investments, made prior to the effective date of this Article, in its current location unless the hardship extension is granted." *Id.*

The independent hearing officer denied Taboo's extension request on November 29, 2013. ECF No. 7-3 at 6. The hearing officer found that Taboo "failed to establish the amount of its investment made prior to December 29, 2011 and it has also failed to establish that it has not reasonably recouped its investment." *Id.* at 5. The hearing officer further found that its accounting paperwork "showed significant inaccuracies, rendering the statements of little or no evidentiary value," that "[t]he bank statements are, likewise, insufficient to show Taboo's investment prior to December 29, 2011 or the amount of investment recouped in that [Taboo's owner] comingled business and personal use of this account," and that "no evidence was presented regarding income and expenses for 2013, which, at the time of [the] hearing, represented an additional 10½ months for Taboo to recoup its investment." *Id.* at 5–6.

Accordingly, the hearing officer denied the extension request. *Id.* at 6.

On December 20, 2013, Taboo filed this action seeking monetary damages, injunctive relief, a declaration that the 2011 and 2012 Ordinances are unconstitutional (both facially and as-applied), and attorneys' fees. ECF No. 1 at 11–12.

At the same time that Taboo filed this action, it filed a motion for preliminary injunction, requesting a preliminary injunction prohibiting the City from taking any action to close the store upon the expiration of its 2013 business license on December 31, 2013, requiring the City to renew Taboo's 2014 business license, and prohibiting the use of law enforcement to close the store until the Court made a final ruling on the case. ECF No. 5. After briefing and a hearing, the Court denied the motion in a written order. ECF No. 19. The Court also denied Taboo's motion to reconsider. ECF Nos. 22, 57.

After the City filed its Answer to the Complaint, ECF No. 20, it filed its Motion for Summary Judgment, ECF No. 25. Taboo then filed its own Motion for Summary Judgment. ECF No. 38. The parties filed extensive briefs, affidavits, and expert reports regarding their respective motions. *See* ECF Nos. 29, 36, 39, 40, 48, 49, 50, 53, 58, 64, 68, 72. After briefing was completed, the Court held a hearing on the motions on January 22, 2015. The matter is now ripe for decision.

## II.    Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. *Id.* at 255. However, "facts must be viewed in the light most favorable to the non-moving party only if there is a genuine dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

In considering cross-motions for summary judgment, the court should "rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." *Monumental Paving & Excavating, Inc. v. Pa. Mfrs. Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

## III.     Discussion

Taboo makes both a facial and an as-applied challenge to the ordinances. However, the analysis for both is the same. *See Independence News, Inc. v. City of Charlotte*, 568 F.3d 148, 155 n.3 (4th Cir. 2009).

The analysis of sexually oriented business legislation consists of three steps. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002) (plurality) (describing the three-step analysis from *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)). The first step is determining whether the regulation bans sexually oriented businesses outright or instead only

restricts when and where they may operate.  If it only restricts when and where they may operate, it is analyzed as a time, place, and manner regulation.  *See Independence News*, 568 F.3d at 154 (citing *Renton*, 475 U.S. at 46).  The second step is determining whether the ordinance is to be treated as content-neutral or content-based.  *See id.* (citing *Renton*, 475 U.S. at 47–49).  If the ordinance is to be treated as a content-neutral time, place, and manner regulation, then the ordinance is subject to intermediate scrutiny.  *Imaginary Images v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010).  If the ordinance is subject to intermediate scrutiny, then the third step is determining whether the regulation is designed to serve a substantial government interest, whether it is narrowly tailored to achieve that interest, and whether it unreasonably limits alternative avenues of communication.  *See Independence News*, 568 F.3d at 154 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989); *Renton*, 475 U.S. at 47).  The Court will address each of these steps.

### A.    Time, place, and manner regulation

The City's ordinances are time, place, and manner regulations.  An ordinance that does not ban sexually oriented businesses outright, and instead only restricts when and where they operate, is analyzed as a time, place, and manner regulation.  *See id.* (citing *Renton*, 475 U.S. at 46).  Here, the City's ordinances do not ban sexually oriented businesses outright.  *See* Columbia, S.C., Code § 11-601(a) (providing that the ordinance has "neither the purpose nor effect of imposing a limitation or restriction on the content or reasonable access to any communicative materials, including sexually oriented materials"); *id.* § 17-371 (same).  Rather, like the ordinances in *Renton* and *Independence News*, the City's ordinances primarily seek to regulate the areas where a sexually oriented business may locate.  *See Renton*, 475 U.S. at 44–45

(prohibiting adult movie theaters from locating within 1,000 feet of any residential zone, single-or multiple-family dwelling, church, park, or school); *Independence News*, 568 F.3d at 151 (prohibiting sexually oriented businesses from locating within various distances from various property uses). Because the City's ordinances are not an outright ban on sexually oriented businesses, they are properly analyzed as time, place, and manner regulations.

### B.    Content-based or content-neutral

Having determined that the City's ordinances are time, place, and manner regulations, the next step is to determine whether they are to be treated as content-based or content-neutral. An ordinance that is aimed at the negative secondary effects of sexually oriented businesses, not the content of the speech, is treated as content-neutral legislation. *Independence News*, 568 F.3d at 154 (citing *Renton*, 475 U.S. at 47–49). When enacting legislation based on secondary effects, a city

> is entitled to "rely heavily on the experience of, and studies produced by, other cities and states, as well as on court opinions from other jurisdictions," [*Mitchell v. Comm'n on Adult Entm't Establishments*, 10 F.3d 123, 133 (3d Cir. 1993)], and need not, before enacting such ordinances, "conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." [*Renton*, 475 U.S. at 51–52].

*Independence News*, 568 F.3d at 155.

The "reasonably believed to be relevant" standard is not arduous. The evidence need not satisfy the demanding standard of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Alameda Books*, 535 U.S. at 439 (plurality); *G.M. Enters., Inc. v. Town of St. Joseph*, 350 F.3d 631, 640 (7th Cir. 2003). The Supreme Court has consistently held that cities "must have latitude to experiment" and that "very little evidence is required" to satisfy the evidentiary

requirement. *Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring). If a city's conclusions appear reasonable, the Court should not find that they are unsupported. *Id.* at 452. Furthermore, as long as the evidence supports the necessary proposition, it is not necessary that the legislators actually reviewed or considered the evidence in passing the ordinance. *See R.V.S., LLC v. City of Rockford*, 361 F.3d 402, 411 n.6 (7th Cir. 2004).

The City's ordinances are explicit in targeting the secondary effects of the speech, not the speech itself. *See* Columbia, S.C., Code § 11-601(a) ("It is the purpose of this Article to regulate sexually oriented businesses in order to promote the health, safety, and general welfare of the citizens of Columbia, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses within Columbia. The provisions of this Article have neither the purpose nor effect of imposing a limitation or restriction on the content or reasonable access to any communicative materials, including sexually oriented materials."); *id.* § 17-371 (same).

Taboo argues that the ordinances are content-based and therefore subject to strict scrutiny. It primarily bases this argument on the timing and circumstances surrounding the 2011 Ordinance's enactment and on statements allegedly made by some of the members of City Council.

Regarding the timing of the 2011 Ordinance's enactment, Taboo argues that animus may be found because the 2011 Ordinance was enacted less than one month after Taboo opened its doors. However, the fact that Taboo's opening spurred the City into action is not controlling, as this does not demonstrate that a ban on Taboo's erotic message was a motive for the ordinances.[1]

---

[1] It is not clear that the entirety of Taboo's erotic message is protected by the Constitution, as there is a circuit split on the issue of whether an outright ban on the sale of sexual devices is constitutional. *Compare Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 744 (5th Cir. 2008)

9

*See D.G. Rest. Corp. v. City of Myrtle Beach*, 953 F.2d 140, 146 (4th Cir. 1991) ("That it took D.G. Restaurant's announced plans to spur the city to this realization [about negative secondary effects concerns] does not in any way impute illicit or unconstitutional motives to the Myrtle Beach city council.").

Taboo also relies on the statements of several of the members of City Council, but those statements are both legally innocuous and irrelevant to the analysis of the issues in this case. Taboo references a newspaper article, which quotes one of the council members as saying, "I just don't think [sexually oriented businesses] belong on major thoroughfares," and that the City needs to "[g]et professionals to tell us where does it [sic] belong." ECF No. 14-3 at 2. That council member later remarked at a council meeting that the zoning changes took sexually oriented businesses away from major commercial corridors and that these businesses were an inappropriate use for general commercial areas. ECF No. 68-2 at 6. Another member said that "the only tragedy in his heart is that we can't zone them out of the city." *Id.*

Contrary to Taboo's assertions, these statements do not necessarily reflect a desire by the council members to *ban* Taboo's message and, instead, are arguably a recognition that the City cannot enact an outright ban, but that it may regulate the location of sexually oriented businesses. Furthermore, even if these statements could be construed as these council members' desires to ban businesses like Taboo's, courts will not strike down otherwise constitutional legislation based on alleged improper legislative motives or statements. *Renton*, 475 U.S. at 47–48; *see also United States v. O'Brien*, 391 U.S. 367, 384 (1968) (declining to void an otherwise constitutional

---

(holding that a Texas ban on the sale of sexual devices was unconstitutional under the Fourteenth Amendment), *with Williams v. Morgan*, 478 F.3d 1316, 1323 (11th Cir. 2007) (holding that an Alabama ban on the sale of sexual devices was constitutional under the Fourteenth Amendment). The Fourth Circuit has not yet weighed in on this debate. For purposes of deciding these motions, it is not necessary for this Court to determine whether the Constitution protects the sale of sexual devices.

statute "which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it"); *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 828 (7th Cir. 1999) (concluding that "[t]he actual motives of those who enacted the ordinance are irrelevant to our First Amendment analysis"); *Ambassador Books v. City of Little Rock*, 20 F.3d 858, 863 (8th Cir. 1994) (concluding that a handwritten statement from the city attorney that he wanted to "shut these places down!" was not sufficient to disregard the stated purpose of the ordinances); *D.G. Rest.*, 953 F.2d at 146 ("[T]he individual motives of legislators, even if those motives are demonstrated to conflict with the expressed purpose of the enacted legislation, are rarely relevant to a court's consideration of the legitimacy of the legislation.").

Taboo also argues that the Court should rely on the Eleventh Circuit's ruling in *Flanigan's Enterprises, Inc. of Georgia v. Fulton County* (*Flanigan's I*), 242 F.3d 976 (11th Cir. 2001), in which that court determined that a county ordinance prohibiting the sale of alcoholic beverages in adult establishments was unconstitutional. However, that case is clearly distinguishable from Taboo's case.

In *Flanigan's I*, the county conducted its own study on the secondary effects of adult entertainment establishments that served alcohol, which showed no increase in crime at such establishments, and, in fact, showed increased calls for service and crime at non-adult entertainment establishments. *Flanigan's I*, 242 F.3d at 979. Additionally, some of the adult establishments conducted their own study, which showed no negative economic impact caused by the clubs, and another study from the county showed the same. *See id.* at 979–80. Despite these local studies showing a lack of negative secondary effects, the county, relying on various foreign studies, passed the ordinance. *Id.* at 980–81. The Eleventh Circuit recognized that a government entity need not conduct its own studies, but, "having done so, the [county] cannot

ignore the results." *Id.* at 986. The court found that "it was unreasonable for [the county] to rely on remote, foreign studies concerning secondary effects when the county's own current, empirical data conclusively demonstrated that such studies were not relevant to local conditions."[2] *Id.*

The holding in *Flanigan's I* is not applicable to this case because the City did not conduct its own local studies prior to enacting the ordinances. Instead, the City relied on dozens of court opinions and orders, reports from various cities across the country, and several journal articles as evidence that sexually oriented businesses have certain negative secondary effects. Columbia, S.C., Code §§ 11-601(b), 17-371. This approach is constitutionally permissible and has been approved by both the Supreme Court and the Fourth Circuit. *See, e.g.*, *Alameda Books*, 535 U.S. at 438 (plurality); *Renton*, 475 U.S. at 51–52; *Imaginary Images*, 612 F.3d at 745; *Independence News*, 568 F.3d at 155.

Taboo also argues that its business is different from the movie theaters and strip clubs in cases such as *Renton* and *D.G. Restaurant* because it is a retail-only store—there is no live entertainment on the premises. Thus, Taboo argues that the cases and other evidence discussing negative secondary effects do not apply to its store. However, the distinction Taboo attempts to make is not supported by the case law.

Under *Renton* and its progeny, the government need only rely on evidence that is "reasonably believed to be relevant to the problem that the [government] addresses." *Renton*, 475 U.S. at 51–52; *accord Alameda Books*, 535 U.S. at 437 (plurality), 451 (Kennedy, J.,

---

[2] After the Eleventh Circuit's ruling in *Flanigan's I*, the county conducted further studies and passed another ordinance similar to the one that was struck down in 2001. *Flanigan's Enters., Inc. of Ga. v. Fulton County* (*Flanigan's II*), 596 F.3d 1265, 1269 (11th Cir. 2010). This time, the county "relied on ample statistical, surveillance, and anecdotal evidence, the live testimony of the chief of police and the chief judge of the juvenile court, among others, and dozens of foreign studies," which was sufficient for the Eleventh Circuit to uphold the ordinance. *Id.*

concurring).  The City argues that under this standard, it did not need to rely on evidence specific to retail-only stores.  The Court agrees.  *See, e.g.*, *Richland Bookmart, Inc. v. Knox County*, 555 F.3d 512, 526 (6th Cir. 2009) ("Requiring local governments to produce evidence of secondary effects for all categories created by every articulable distinction is a misapprehension of the Supreme Court's holding that governments may rely on any evidence 'reasonably believed to be relevant.'" (citing *Alameda Books*, 535 U.S. at 438–39 (plurality))); *ILQ Invs., Inc. v. City of Rochester*, 25 F.3d 1413, 1418 (8th Cir. 1994) ("ILQ argues that Rochester was constitutionally required to disregard these studies because none evaluated the secondary effects of a bookstore offering non-adult as well as adult materials and having no facilities for on-premises consumption.  That is simply not the law.").

Furthermore, even though the City was not required to, it did, in fact, rely on evidence about negative secondary effects arising from retail-only stores in enacting the ordinances, including *H&A Land Corp. v. City of Kennedale*, 480 F.3d 336 (5th Cir. 2007); *World Wide Video of Washington, Inc. v. City of Spokane*, 368 F.3d 1186 (9th Cir. 2004); *Reliable Consultants, Inc. v. City of Kennedale*, No. 4:05-CV-166-A, Findings of Fact and Conclusions of Law (N.D. Tex. May 26, 2005); *People ex rel. Deters v. The Lion's Den, Inc.*, Case No. 04-CH-26, Modified Permanent Injunction Order (Ill. 4th Judicial Cir., Effingham County, July 13, 2005); the documentary evidence on negative secondary effects that the City of Spokane relied on in enacting its ordinances; and Richard McCleary, *Rural Hotspots: The Case of Adult Businesses*, 19 Criminal Justice Policy Review 153 (2008).  The Constitution does not require more.

Taboo relies on the extensive filings and reports prepared by its expert, R. Bruce McLaughlin, who essentially concludes that the secondary effects evidence relied on by the City

13

does not support the ordinances. *See, e.g.*, ECF Nos. 40-1 at 27, 40-2 at 1, 40-7 at 26–27. He is primarily offered by Taboo as an expert in the area of land use planning. The issue of secondary effects evidence and its sufficiency under the relevant case law is a legal question beyond his area of expertise. Other courts that have considered his legal opinions have given them limited or no consideration. *See, e.g.*, *World Wide Video of Wash., Inc. v. City of Spokane*, 227 F. Supp. 2d 1143, 1149 n.3 (E.D. Wash. 2002), *aff'd*, 368 F.3d 1186 (9th Cir. 2004) (concluding that McLaughlin was "not qualified to render what are essentially legal opinions and conclusions"); *Colacurcio v. City of Kent*, 944 F. Supp. 1470, 1473 n.2 (W.D. Wash. 1996), *aff'd*, 163 F.3d 545 (9th Cir. 1998) ("McLaughlin has no specialized knowledge, skill, training, education, or experience that would qualify him to offer an opinion on the purpose of the ordinance. Moreover, his opinion is based on speculation and conjecture.").

Further, McLaughlin questions the validity of the City's fact-finding, concluding that "the City's predicate documents . . . offer not an iota of evidence" regarding any significant crime or disorderly conduct related to take-home only stores, ECF No. 40-1 at 27, and that "[n]o reasonable land use planner or governmental official could possibly believe that the City of Columbia 'predicate' offers any proof whatsoever that sexually oriented Adult Use cause [sic] unique 'adverse secondary effects,'" ECF No. 40-7 at 26. Again, the issue of secondary effects is a legal analysis, not a land planning one. The many hundreds of pages of paperwork and reports submitted by McLaughlin demonstrate, at most, that the City could have reached a different conclusion about the link between sexually oriented businesses and negative secondary effects.[3] However, the fact that the City could have drawn a different conclusion does not mean

---

[3] Throughout its briefs, Taboo refers generally to McLaughlin's affidavits and reports, but rarely directs the Court to any specific portion of the affidavits and reports. "The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material

that the conclusion they did draw was without support.  *See G.M. Enters.*, 350 F.3d at 639.  The

Court is not required to re-weigh the evidence considered by the City, and the Court will not

substitute its judgment for that of the Columbia City Council.  *See Imaginary Images*, 612 F.3d

at 747; *Fantasy Ranch, Inc. v. City of Arlington*, 459 F.3d 546, 560–61 (5th Cir. 2006); *G.M.

Enters.*, 350 F.3d at 639–40; *see also Alameda Books*, 535 U.S. at 451–52 (Kennedy, J.,

concurring) ("As a general matter, courts should not be in the business of second-guessing fact-

bound empirical assessments of city planners.  The Los Angeles City Council knows the streets

of Los Angeles better than we do." (citation omitted)).[4]

Taboo also directs the Court's attention to a study of the commercial corridor where

Taboo is located that the City conducted around the time period that Taboo opened.  Taboo

questions why the City did not use that study to evaluate the impact of Taboo's business.  This

misses the point, as there is no requirement that cities conduct their own studies, even if they

have the ability to do so.  *See, e.g.*, *Renton*, 475 U.S. at 51–52.

Similarly, Taboo argues that there have been no negative secondary effects at its location

and points to much new development nearby.  It also notes that its building was in a dilapidated

condition with vagrants living inside prior to Taboo's renovations.  The City does not

strenuously contest these points, asserting that they are not relevant.  The Court agrees with the

City.  While Taboo may well have operated with minimal, if any, negative secondary effects

---

fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989).

[4] The Court also notes that McLaughlin's conclusions (and other experts' similar conclusions) regarding the sufficiency of secondary effects evidence relied on by municipalities have not been embraced by other courts.  *See Doctor John's v. Whalen*, 542 F.3d 787, 791–94 (10th Cir. 2008); *World Wide Video*, 368 F.3d at 1195; *Regensberger v. City of Waterbury*, No. 3:04-cv-01900 (PCD), 2008 WL 3992650, at *13–14 (D. Conn. Aug. 25, 2008); *Ill. One News, Inc. v. City of Marshall*, No. 04 CV 4055 JPG, 2006 WL 449018, at *15–16 (S.D. Ill. Feb. 22, 2006); *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 114 F. Supp. 2d 531, 547 (N.D. Tex. 2000), *aff'd*, 295 F.3d 471 (5th Cir. 2002).

during its two-year existence, this does not affect the constitutional analysis.[5]

*Independence News* is instructive.  There, the City of Charlotte passed an ordinance similar to the City's, and the ordinance included an amortization period.  *See Independence News*, 568 F.3d at 151.  Shortly before the end of the amortization period, two sexually oriented businesses challenged the constitutionality of the ordinance and made substantially the same arguments that Taboo makes—property values had held steady or increased, no sex-related crimes had occurred in the area, crime in general had not increased, a number of businesses had located nearby, and residential construction was taking place.  *See id.* at 152–53.  The businesses argued that the ordinance was unconstitutional as-applied to their establishments because the theoretical justification for the ordinance was not borne out by the data gathered after passage.  *See id.* at 155.  However, the Fourth Circuit held that Charlotte did not have to show that a particular establishment generated negative secondary effects in order to enforce the ordinance against it.  *Id.* at 156.  The only question was "whether the City had a sufficient evidentiary basis for adopting the ordinance . . . ."  *Id.*

That analysis directly applies to this case.  The City is not required to show that Taboo has actually generated negative secondary effects in order to enforce the ordinances against it.  *Id.*  That Taboo may not have generated negative secondary effects is not relevant to the constitutional question.  *Id.*  Instead, the primary question under the *Renton* analysis is whether, in enacting the ordinance, the City relied on evidence reasonably believed to be relevant to the problem of negative secondary effects.  *Id.*  As discussed, the City did so, and the ordinances are therefore treated as content-neutral legislation.

---

[5] The only evidence in the record that could be considered a negative secondary effect arising from Taboo's operation was testimony at the preliminary injunction hearing that a fast food restaurant next door to Taboo constructed a privacy fence to shield the view of Taboo's store after receiving customer complaints.

Accordingly, the Court concludes that the ordinances are to be treated as content-neutral time, place, and manner restrictions, and are therefore subject to intermediate scrutiny. *Imaginary Images*, 612 F.3d at 742.

### C.    Substantial government interest, narrow tailoring, and alternative avenues of communication

For regulations subject to intermediate scrutiny, the third step of the *Renton* analysis is comprised of three separate requirements:  (1) the regulations must be designed to serve a substantial government interest; (2) they must be narrowly tailored to achieve that interest; and (3) they must not unreasonably limit alternative avenues of communication.  *See Independence News*, 568 F.3d at 154 (citing *Ward*, 491 U.S. at 798; *Renton*, 475 U.S. at 47).

#### 1.    *Substantial government interest*

It is well-established that attempting to preserve the quality of urban life and prevent negative secondary effects from sexually oriented businesses are substantial government interests.  *See, e.g.*, *Alameda Books*, 535 U.S. at 435 (plurality); *Renton*, 475 U.S. at 50; *Imaginary Images*, 612 F.3d at 747.  Because these are the interests the City seeks to protect with its ordinances, the Court finds that the ordinances are designed to serve a substantial government interest.  *See* Columbia, S.C., Code § 11-601(a) ("It is the purpose of this Article to regulate sexually oriented businesses in order to promote the health, safety, and general welfare of the citizens of the City, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses within the City."); *id.* § 17-371 (same).

2.        *Narrow tailoring*

Having determined that the ordinances are designed to serve the City's substantial government interests, the next step is to determine whether the ordinances are narrowly tailored to serve those interests. "[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. "[I]t need not be the least restrictive or least intrusive means of doing so." *Id.* at 798. "[T]he validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Id.* at 801. "[T]he regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800; *see also Alameda Books*, 535 U.S. at 451–52 (Kennedy, J., concurring) ("The Los Angeles City Council knows the streets of Los Angeles better than we do. It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion."). Because, looking at the ordinances as a whole, the City's interests "would be achieved less effectively absent the regulation," the Court finds that the City's ordinances are narrowly tailored. *Ward*, 491 U.S. at 799.

Taboo has also asserted various "scalpel" arguments that it asserts render several particular provisions in the ordinances unconstitutional as not being narrowly tailored.

a.        *Hours of operation*

First, Taboo argues that the restrictions on hours of operation for a sexually oriented

business are unconstitutional.  However, it is not unconstitutional to restrict the hours during which a sexually oriented business may operate.  *See, e.g.*, *Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435, 441 (6th Cir. 1998) ("It is not unreasonable to believe that such regulation of hours of shops selling sex literature would tend to deter prostitution in the neighborhood at night or the creation of drug 'corners' on the surrounding streets.  By deterring such behavior, the neighborhood may be able to ward off high vacancy rates, deteriorating store fronts, a blighted appearance and the lowering of the property values of homes and shopping areas.  Such regulation may prevent the bombed-out, boarded-up look of areas invaded by such establishments.  At least that is the theory, and it is not unreasonable for legislators to believe it based on evidence from other places.").  In fact, time restrictions much more severe than the City's have been held to be constitutional.  *See, e.g.*, *Mitchell*, 10 F.3d at 139 (upholding an ordinance requiring sexually oriented businesses to be closed from 10:00 PM to 10:00 AM, Monday through Saturday, and requiring them to be closed all day on Sundays and holidays).  Because the City's interests would be achieved less effectively absent this regulation, the Court concludes that these restrictions are narrowly tailored.  *Ward*, 491 U.S. at 799.

b.    *Multiple uses*

Taboo also objects to the ordinances' provision restricting sexually oriented businesses to providing only one particular classification of adult material or entertainment at a single location.  *See* Columbia, S.C., Code § 11-617(f) ("No person shall operate more than one sexually oriented business or classification of sexually oriented business in a single building or structure.").  Taboo argues that this restriction effectively makes it impossible for a sexually oriented business to operate in the City and is therefore unconstitutional.  However, similar restrictions have been

approved by both the Supreme Court and the Fourth Circuit.

The Court in *Alameda Books* was presented with such a restriction, which prohibited "the establishment or maintenance of more than one adult entertainment business in the same building, structure or portion thereof." *Alameda Books*, 535 U.S. at 431 (plurality). The plaintiffs in that case each operated an adult bookstore and an adult video arcade within the same building. *Id.* at 429. The Court held that the city could infer that reducing the concentration of adult operations in a neighborhood, whether within separate establishments or in one larger establishment, will reduce negative secondary effects. *See id.* at 436 (plurality), 450–53 (Kennedy, J., concurring). The Fourth Circuit, in both pre- and post-*Renton* decisions, has come to the same conclusion regarding similar provisions. *See Independence News*, 568 F.3d at 151; *Hart Book Stores, Inc. v. Edmisten*, 612 F.2d 821, 826–27 (4th Cir. 1979). Because the City's interests would be achieved less effectively absent this regulation, the Court concludes that these restrictions are narrowly tailored. *Ward*, 491 U.S. at 799.

c.    *Employee licensing*

Taboo objects to the ordinances' requirements for employee licensing, including that the employees of a sexually oriented business must file in person a notarized license application with the City. However, an employee's personal history, including any prior sexual offenses, is "plainly correlated with the side effects that can attend these businesses, the regulation of which was the legislative objective." *TK's Video, Inc. v. Denton County*, 24 F.3d 705, 710 (5th Cir. 1994), *abrogated on other grounds by City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004). Such regulations are frequently upheld. *See, e.g.*, *Entm't Prods., Inc. v. Shelby County*, 588 F.3d 372, 376 (6th Cir. 2009) (upholding denial of request for preliminary injunction based

20

on state statute that contained licensing requirement).  Requiring an in-person, notarized license application would enhance the City's ability to positively identify the employees seeking a license to work at a sexually oriented business.  Because the City's interests would be achieved less effectively absent this regulation, the Court concludes that these restrictions are narrowly tailored.  *Ward*, 491 U.S. at 799.

### 3.    *Alternative sites*

Having determined that the ordinances are narrowly tailored to achieve the City's substantial interests, the final step in the *Renton* analysis is to determine whether the ordinances unreasonably limit alternative avenues of communication.  This analysis relates to a determination of whether alternative sites are available where a sexually oriented business could operate.  Under this test, the City's ordinances must not deny sexually oriented businesses a reasonable opportunity to open and operate in the city.  *Renton*, 475 U.S. at 54.  There is no mathematical formula used to determine whether there are sufficient alternative avenues of communication.  However, there are some general rules that apply.

The fact that land available for use by a sexually oriented business may already be occupied, not for sale, or not commercially viable is irrelevant to the question of whether alternative sites are available.  *See Renton*, 475 U.S. at 53–54.  Land deemed available includes "acreage in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space."  *Id.*  Private deed restrictions and the economic feasibility of relocating are not First Amendment concerns.  *See David Vincent, Inc. v. Broward County*, 200 F.3d 1325, 1334 (11th Cir. 2000) ("[T]he First Amendment is not concerned with restraints that are not imposed by the government itself or the physical characteristics of the sites designated for adult

use by the zoning ordinance.  It is of no import under *Renton* that the real estate market may be tight and sites currently unavailable for sale or lease, or that property owners may be reluctant to sell to an adult venue."); *MJJG Rests., LLC v. Horry County*, 11 F. Supp. 3d 541, 563 (D.S.C. 2014) ("Plaintiffs' concerns about . . . private deed restrictions . . . simply have no constitutional significance.").  While relocating may be difficult for Taboo, the City is not constitutionally obligated to provide commercially desirable land.  *See, e.g.*, *Renton*, 475 U.S. at 54 ("That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation."); *Allno Enters., Inc. v. Baltimore County*, 10 F. App'x 197, 202 (4th Cir. 2001) ("Examples of impediments to the relocation of an adult business that may not be of constitutional magnitude include having to build a new facility instead of moving into an existing building; having to clean up waste or landscape a site; bearing the costs of generally applicable lighting, parking, or green space requirements; making due with less space than one desired; or having to purchase a larger lot than one needs."); *D.G. Rest.*, 953 F.2d at 147 (restricting strip clubs to "a few poorly lit sites in industrial areas, far from the tourist-oriented businesses" did not violate the Constitution).

a.    *Court's list of alternative sites*

The question of the availability of alternate sites for Taboo is important to resolution of the summary judgment motions.  For this reason, the Court will evaluate the sites that the City asserts are available and Taboo's assertions to the contrary.  For the reasons discussed below, the Court concludes, both factually and legally, that parcels are available to Taboo.  After consideration of McLaughlin's evidence, the Court finds that there is no factual dispute

22

regarding availability of alternate sites.

The City, relying on the affidavit of Krista Hampton, the City's director of the Planning and Development Service Department, contends that there are forty-six sites available for a sexually oriented business to locate.  *See* Hampton Aff., ECF No. 64-2.  The parties' lists of sites each use their own numbers for the sites instead working off of one list, which creates some confusion as a result of that numbering.  Additionally, some of the parcels have been renumbered or altered as a result of boundary clarifications, subdivisions, and the like that have occurred since the preliminary injunction hearing in January 2014.  In an effort to clarify the parties' positions, the Court has prepared its own list, with basic numbering, which is as follows:[6]

| Site No. | Address | TMS No. | Acreage (to nearest hundredth acre) |
|---|---|---|---|
| 1 | 1021 Ponderosa Point Drive | 09414-01-03 | 32.78 |
| 2 | 161 Winhill Drive | 09414-01-12 | 0.68 |
| 3 | 121 Shop Road Extension | 16200-04-18 | 6.69 |
| 4 | 2150 S Beltline Boulevard | 13605-02-01 | 16.29 |
| 5 | 7607 Richard Street | 16305-05-01 | 14.99 |
| 6 | 121 Atlas Road | 16306-03-01 | 6.69 |
| 7 | 111 Atlas Court | 16306-03-05 | 3.22 |
| 8 | 1320 Veterans Road | 16301-01-02 | 1.25 |
| 9 | 1424 Atlas Road | 16305-02-08 | 2.29 |
| 10 | 1049 Second Avenue | 13512-04-02 | 2.09 |
| 11 | 2720 A Street | 13507-02-02 | 1.95 |
| 12 | 2791 The Boulevard | 13512-02-03 | 1.79 |
| 13 | 1325 Veterans Road | 16301-02-07 | 0.10 |
| 14 | 121 Atlas Court | 16305-01-03 | 1.28 |
| 15 | 1601 Atlas Road | 16301-02-03 | 1.23 |
| 16 | 1404 Atlas Road | 16305-02-01 | 0.30 |
| 17 | 1404 Atlas Road | 16305-02-01 | 0.22 |
| 18 | 1400 Atlas Road | 16305-02-12 | 0.25 |
| 19 | 131 Cort Road | 11704-03-30 | 0.43 |
| 20 | 1201 First Street South | 13512-04-05 | 0.98 |
| 21 | 7450 Richard Street | 16305-02-07 | 0.84 |

---

[6] The primary documents upon which the Court based its list are Hampton's site list, ECF No. 64-2 at 3, and McLaughlin's site list, ECF No. 36-2 at 2.  The sites are listed in the order that they are found on Hampton's list because that is the most up-to-date list.

| 22 | 941 Spears Creek Court | 25714-01-07 | 0.83 |
|---|---|---|---|
| 23 | 181 Winhill Road | 09414-01-04 | 1.83 |
| 24 | S/S Airline Drive | 11214-01-03 | 0.72 |
| 25 | 1464 Sunset Drive | 09115-01-01 | 0.71 |
| 26 | 2761 The Boulevard | 13512-02-02 | 0.68 |
| 27 | 700 Buckner Road | 09316-03-12 | 0.61 |
| 28 | 2771 The Boulevard | 13512-02-01 | 0.55 |
| 29 | 2781 The Boulevard | 13512-02-05 | 0.55 |
| 30 | 931 Spears Creek Court | 28802-02-05 | 2.06 |
| 31 | 1021 Second Avenue | 13512-04-06 | 0.38 |
| 32 | 1119 Airport Boulevard | 11214-01-01 | 0.33 |
| 33 | 730 Buckner Road | 11704-03-26 | 0.27 |
| 34 | 1416 Atlas Road | 16305-02-11 | 0.62 |
| 35 | E/S Park Central Drive | 09115-01-13 | 0.23 |
| 36 | 3000 Harden Street | 11502-02-01 | 0.17 |
| 37 | 400 Buckner Road | 09312-03-03 | 0.17 |
| 38 | NX 2781 The Boulevard | 13512-02-04 | 0.16 |
| 39 | 131 Atlas Court | 16305-01-02 | 0.12 |
| 40 | 2420 Shop Road | 13610-01-08 | 4.35 |
| 41 | 2240 S Beltline Boulevard | 13605-02-03 | 4.30 |
| 42 | 710 Buckner Road | 09316-03-13 | 1.94 |
| 43 | W/S Shop Grove Drive | 16202-03-01 | 0.98 |
| 44 | W/S Shop Grove Drive | 16202-03-02 | 1.58 |
| 45 | 105 Shop Grove Drive | 16202-01-01 | 2.68 |
| 46 | 151 Shop Grove Drive | 16202-01-02 | 15.18 |
|  |  |  |  |
|  | **TOTAL** |  | 138.34 |

Hampton represents that the forty-six sites on this list meet the sexually oriented business regulations in the ordinances. Hampton Aff. ¶ 3. She also represents that none of the sites are in an overlay district that would disallow a sexually oriented business, *id.* ¶ 5, and McLaughlin has no evidence to the contrary, McLaughlin Dep. 81:18–82:2, July 31, 2014, ECF No. 64-1.

         b.    *Taboo's objections*

Taboo contends that none of these forty-six sites are available, and McLaughlin has registered specific reasons for that contention. McLaughlin Aff. ¶¶ 30–39, ECF No. 36.

McLaughlin has divided the parcels into sections based on his reasons for excluding them from the list of available sites.  For ease of reference, the Court will address the availability of the parcels in the same manner.

i.     Disqualifying land uses

McLaughlin asserts that the following parcels are unavailable based on disqualifying land uses that the City overlooked:[7]

    22.    941 Spears Creek Court.[8]

    18.    1400 Atlas Road.[9]

    16/17.  1404 Atlas Road.[10]

    21.    7450 Richard Street.[11]

    15.    1601 Atlas Road.[12]

    13.    1325 Veterans Road.[13]

---

[7] The site numbers are from the Court's list.

[8] Site No. 11 on McLaughlin's list.

[9] Site No. 21 on McLaughlin's list.

[10] Site No. 22 on McLaughlin's list.  This was one parcel at the time the City prepared its initial list for the preliminary injunction hearing, but sometime after that hearing, it may have been subdivided into two parcels.  *See* Hampton Aff. at 17.  They appear as two sites on the City's list (16a and 16b) with different acreage, even though they have the same street address and the same TMS number.  *Id.* at 3.  Because the City has them listed as two parcels and because they have different acreage, the Court will treat them as two sites (Nos. 16 and 17 on the Court's list).  However, whether they are treated as one or two sites has no impact on the Court's ultimate decision.

[11] Site No. 24 on McLaughlin's list.

[12] Site No. 27 on McLaughlin's list.

McLaughlin Aff. ¶ 30.


### 941 Spears Creek Court


Regarding 941 Spears Creek Court, McLaughlin asserts that it is "[d]isqualified by an abutting use devoted to residential use." *Id.* ¶ 30(a). He does not go into any further detail in his affidavit, but in his deposition, he stated that the "residential use" is an extended-stay hotel on the adjacent parcel. McLaughlin Dep. 49:12–25. He stated that some of the hotel's guests are long-term, though he did not dispute that it is a commercial establishment. *Id.* 49:19–50:19. He did not know whether a majority of the guests are long-term. *Id.* 57:11–16. However, he asserted that because "some" of the guests at the hotel are long-term, permanent residents of the hotel (at least according to his conversation with the manager), he considered the property "a lot devoted to residential use." *Id.* 54:1–57:22.

Hampton responds by stating that the extended-stay hotel "is not in a residential zoning district, and the lot is not devoted to residential use as that phrase is used in section 17-374 of the zoning ordinance." Hampton Aff. ¶ 7

There is no genuine dispute as to any material fact regarding 941 Spears Creek Road. The parties agree that there is an extended-stay hotel on the adjacent parcel, and the City does not dispute that at least some of its guests stay there long-term. Taboo does not raise any other basis for excluding 941 Spears Creek Road from the list of available sites. Given that there is no dispute as to any material fact regarding this site, the question of whether or not it is legally available may be resolved by this Court at summary judgment.

---

[13] Site No. 26 on McLaughlin's list.

Taboo does not cite any authority for its proposition that a hotel, clearly a commercial establishment, can become "a lot devoted to residential use" based on the length of time an unknown number of guests stay at the hotel. Furthermore, Hampton stated in her affidavit that the hotel is not "devoted to residential use," as that phrase is used in the ordinances. *Id.* Thus, having taken this position, the City would be precluded from asserting that 941 Spears Creek Road is not available if Taboo sought to relocate to that site. Accordingly, the Court concludes that, based on the evidence of record, 941 Spears Creek Road is available for use by a sexually oriented business.[14]

<u>1400 Atlas Road; 1404 Atlas Road; 7450 Richard Street</u>

Regarding 1400 Atlas Road, 1404 Atlas Road, and 7450 Richard Street, McLaughlin asserts that these sites are "disqualified by Sweet Home Baptist Church." McLaughlin Aff. ¶ 30(b)–(d). In his deposition, McLaughlin discussed the location of Sweet Home Baptist Church, and the discussion between him and the City's counsel indicates that the City had missed this church when preparing its initial list of available sites for the preliminary injunction hearing. *See* McLaughlin Dep. 57:23–59:4. The City fixed this mistake on its current list, and the deposition proceeded with a discussion that took into account the setback from the church

---

[14] The City also has 931 Spears Creek Road—the parcel where the hotel is located—on its list of available sites (Site No. 30 on the Court's list), and McLaughlin did not raise any objection to the availability of that site in his affidavit. In his deposition, he stated that if Taboo "acquired it and could get through all the permitting issues—it's a residential hotel occupancy, if you could acquire it and get through all the permitting issues to change it to a book store or cabaret, then you would be removing the disqualifier and making the site available." McLaughlin Dep. 53:12–17. Thus, because the City represents that 931 Spears Creek Road is available and McLaughlin did not raise any specific objection to it, the Court concludes that, based on the evidence of record, 931 Spears Creek Road is available for use by a sexually oriented business.

that was required by § 17-374(c).  McLaughlin agreed that, after taking into account the setback required by the church, at least a portion of these three sites are "available by geometry,"[15] as long as they either have road frontage or could be combined with other sites to obtain road frontage.  *See id.* 62:18–63:12.  McLaughlin did not state in his affidavit or deposition that there is any barrier to a sexually oriented business at least being able to combine these sites with others to obtain road frontage.

There is no genuine dispute as to any material fact regarding these parcels.  The parties agree that at least a portion of each of these sites is available, and McLaughlin did not state that the parcels lack either road frontage or the ability to obtain road frontage by combining other parcels.  Taboo does not raise any other basis for excluding these sites from the list of available sites.  Given that there is no dispute as to any material fact regarding these sites, the question of whether or not they are legally available may be resolved by this Court at summary judgment.

Because the ordinances only bar any portion of the sexually oriented business's *building* from being within the buffer zone, *see* Columbia, S.C., Code § 17-374(g), not the parcel itself, the fact that only portions of these sites are available is irrelevant.[16]  Accordingly, the Court concludes that, based on the evidence of record, 1400 Atlas Road, 1404 Atlas Road, and 7450 Richard Street are available for use by a sexually oriented business.

---

[15] McLaughlin used this phrase throughout his deposition to describe sites that are in the correct zoning district and outside the distance buffers, but may not meet some subjective factors that he might consider in disqualifying a site.  *See* McLaughlin Dep. 60:25–61:22.

[16] The Court notes that McLaughlin has not made any argument that any of the available portions of the parcels are too small to host a sexually oriented business.

<u>1601 Atlas Road; 1325 Veterans Road</u>

Regarding 1601 Atlas Road and 1325 Veterans Road, McLaughlin asserts that these sites are "disqualified by the future home of Sweet Home Baptist Church."    McLaughlin Aff. ¶ 30(e)–(f).  He states that the church owns a nearby parcel and that this church-owned parcel would disqualify 1601 Atlas Road and 1325 Veterans Road.  *Id.*  Additionally, there is a sign on that parcel that says that it is the future home of the church.  McLaughlin Dep. 64:19–65:2; Hampton Aff. ¶ 8.  The sign has been on the property for many years, but no development permits have been issued for the site, and the City does not consider the site to be a "church," as that term is used in the ordinances.  Hampton Aff. ¶ 8.

There is no genuine dispute as to any material fact regarding these parcels.  The parties agree that a nearby parcel is owned by a church and that there is a sign on that parcel that it is the future home of the church.  Taboo does not dispute that the sign has been there for many years and that no development permits have been issued for the site.   Taboo does not raise any other basis for excluding these sites from the list of available sites.  Given that there is no dispute as to any material fact regarding these sites, the question of whether or not they are legally available may be resolved by this Court at summary judgment.

Taboo does not cite any authority for its proposition that the church-owned property is a "church" for purposes of the distance buffer, nor is the Court aware of any such authority.  Furthermore, Hampton stated in her affidavit that the City does not consider the church-owned parcel to be a "church," as that word is used in the ordinances.  Thus, having taken this position, the City would be precluded from asserting that these sites are not available as a result of their proximity to the church-owned site if Taboo sought to relocate to one of those sites.  Accordingly, the Court concludes that, based on the evidence of record, 1601 Atlas Road and

1325 Veterans Road are available for use by a sexually oriented business.

### ii.    Road frontage

McLaughlin asserts that the following parcels are unavailable because they are not adjacent to a public street:[17]

      1.    1021 Ponderosa Point Drive.[18]

      23.    181 Winhill Road.[19]

McLaughlin Aff. ¶ 32.

### 1021 Ponderosa Point Drive

Regarding 1021 Ponderosa Point Drive, McLaughlin asserts that "Ponderosa Point Drive, which appears to be a private road, was blocked with a chain indicating no access to the interior of the lot." *Id.* ¶ 32(b) n.7.  However, in his deposition, he acknowledged that if a site fronted on a private street that met the subdivision regulations, that site would be available.  McLaughlin Dep. 27:6–14.  In Hampton's affidavit, she stated that the site has frontage on Ponderosa Point Drive, which is "a private street that meets all standards of the subdivision regulations of the zoning ordinance and the curb cut ordinance that are referenced in section 17-207 of the zoning ordinance."  Hampton Aff. ¶ 6.

---

[17] Sites No. 1 (Patton Circle, East Side) and No. 3 (Ponderosa Point Drive, East Side) on McLaughlin's list were crossed off on the City's final list of available sites and are therefore also not included on the Court's list.

[18] Site No. 2 on McLaughlin's list.

[19] Site No. 5 on McLaughlin's list.

There is no genuine dispute as to any material fact regarding 1021 Ponderosa Point Drive. The parties agree that if a site fronts on a private street that meets the subdivision regulations, it is available. Hampton stated that the site does so, and Taboo has not offered any evidence to contradict that statement. Taboo does not raise any other basis for excluding it from the list of available sites. Given that there is no dispute as to any material fact regarding this site, the question of whether or not it is legally available may be resolved by this Court at summary judgment.

In light of Hampton's unchallenged statement in her affidavit that Ponderosa Point Drive meets the subdivision regulations, the Court concludes that, based on the evidence of record, 1021 Ponderosa Point Drive is available for use by a sexually oriented business.

<u>181 Winhill Road</u>

Regarding 181 Winhill Road, McLaughlin does not go into any detail in his affidavit, other than his general statement that it is one of the parcels that are not available because they are not adjacent to a public street. McLaughlin Aff. ¶ 32(d). However, in his deposition, he stated that he was able to access that site with road frontage and that it should therefore be deleted from the list of disqualified sites. McLaughlin Dep. 70:11–19.

There is no genuine dispute as to any material fact regarding 181 Winhill Road. The City asserts that the site is available and McLaughlin stated that it should no longer be included in his list of disqualified sites. Taboo does not raise any other basis for excluding it from the list of available sites. Given that there is no dispute as to any material fact regarding this site, the question of whether or not it is legally available may be resolved by this Court at summary judgment.

In light of the City's now-unchallenged position that the site is available, the Court concludes that, based on the evidence of record, 181 Winhill Road is available for use by a sexually oriented business.

### iii.     Deed restrictions

McLaughlin asserts that the following parcel is unavailable based on deed restrictions:

      35.     E/S Park Central Drive.[20]

McLaughlin Aff. ¶ 33.

### E/S Park Central Drive

Regarding E/S Park Central Drive, McLaughlin asserts that it is disqualified because the site "is an open space easement owned by the Park Central Owners' Association and serving the adjacent office park development." *Id.* ¶ 33(a). In his deposition, he stated that this parcel is owned by the condo association as an amenity for the office park. McLaughlin Dep. 70:20–71:4. However, he acknowledged that it is privately owned and could be sold by the condo association. *Id.* at 71:5–13. He also stated that it was not available because it was lowland subject to wetland regulations, though he acknowledged that a buyer could get permits and bring in soil to solve the wetland issue. *Id.* 71:15–72:1. He also stated that it did not have a deed restriction affirmatively excluding sexually oriented businesses. *Id.* 72:2–5.

There is no genuine dispute as to any material fact regarding E/S Park Central Drive. The parties agree that it is an open space easement, privately owned by the office park's condo

---

[20] Site No. 13 on McLaughlin's list.

association and that it could be sold by the condo association.  McLaughlin also acknowledged that, though it may be subject to wetland regulations, this obstacle could be handled by obtaining the necessary permits and bringing in soil.  Taboo does not raise any other basis for excluding it from the list of available sites.  Given that there is no dispute as to any material fact regarding this site, the question of whether or not it is legally available may be resolved by this Court at summary judgment.

Taboo's objections to the availability of this site—that it has a private deed restriction holding it as an open space easement and that it may require wetland remediation—may be practical considerations for Taboo, but they are not First Amendment concerns that would render the site legally unavailable.  *See David Vincent*, 200 F.3d at 1334 ("[T]he First Amendment is not concerned with restraints that are not imposed by the government itself or the physical characteristics of the sites designated for adult use by the zoning ordinance."); *MJJG Rests.*, 11 F. Supp. 3d at 563 ("Plaintiffs' concerns about . . . private deed restrictions . . . simply have no constitutional significance.").  Accordingly, the Court concludes that, based on the evidence of record, E/S Park Central Drive is available for use by a sexually oriented business.

### iv.    Permanent occupant

McLaughlin asserts that the following parcel is unavailable because it is occupied by a permanent occupant not likely to relocate:

36.    3000 Harden Street.[21]

_____

[21] This parcel is Site No. 12 on McLaughlin's list.  In his affidavit, he listed the address as 3500 Harden Street, but it appears that this is a typographical error, as both the City and he listed the address as 3000 Harden Street in their respective site lists.  ECF Nos. 36-2 at 2, 64-2 at 3.

McLaughlin Aff. ¶ 34.

3000 Harden Street

Regarding 3000 Harden Street, McLaughlin asserts that it is disqualified because it is owned by a permanent occupant not likely to relocate, specifically South Carolina Electric and Gas Company ("SCE&G"). *Id.* ¶ 34(a). In his deposition, he further stated that he knows it is a permanent occupant because "it was clearly a major office facility and a major base for their repair trucks." McLaughlin Dep. 15:12–18. However, he acknowledged that SCE&G is a privately-owned utility with stockholders and, for the right price, it could move. *Id.* 72:15–19.

There is no genuine dispute as to any material fact regarding 3000 Harden Street. The City does not dispute that it is owned by SCE&G and is a major facility, and Taboo does not dispute that it is privately-owned and could be purchased for the right price. Taboo does not raise any other basis for excluding it from the list of available sites. Given that there is no dispute as to any material fact regarding this site, the question of whether or not it is legally available may be resolved by this Court at summary judgment.

Like with Taboo's objections to the availability of E/S Park Central Drive discussed above, Taboo's objection to this site—that its occupant is unlikely to move in the near future—may be a practical consideration for Taboo, but it is not a First Amendment concern that would render the site legally unavailable. *See David Vincent*, 200 F.3d at 1334–35 ("[T]he economic feasibility of relocating to a site is not a First Amendment concern. . . . It is of no import under *Renton* that the real estate market may be tight and sites currently unavailable for sale or lease, or that property owners may be reluctant to sell to an adult venue."); *Woodall*, 49 F.3d at 1125–26 ("The Adult Businesses claimed that some sites were unavailable because the owner of the site

34

probably would not rent or sell to an adult business, or because the building was currently
occupied or leased, neither of which is of any obvious concern under *Renton*. *Renton*'s
prohibition against consideration of economic impact forecloses inquiry into whether a
relocation site is only 'potentially' as opposed to 'actually' available.").  Because Taboo's
objection is not constitutionally significant, the Court concludes that, based on the evidence of
record, 3000 Harden Street is available for use by a sexually oriented business.

v.       Not suitable for generic commercial use and requiring
generic permits

McLaughlin asserts that the following parcels are unavailable "because they are not part
of the relevant real estate market, they are not generic commercial in nature, and they require the
City of Columbia to approve discretionary, generic permits for their development or
redevelopment":[22]

---

[22] Site No. 1 (Patton Circle, West Side) on McLaughlin's list was included in the City's list of
available sites for the preliminary injunction hearing, ECF No. 7-2 at 2 No. 9, but was crossed
off on the City's final list of available sites.  Accordingly, it is not included on the Court's list.

Site No. 4 (Winhill Road, North Side) on McLaughlin's list was included in the City's list of
available sites for the preliminary injunction hearing, ECF No. 7-2 at 2 No. 29, but was not
included in the City's current list.  Accordingly, it is not included on the Court's list.

Site No. 32 (2716 Shop Road) on McLaughlin's list was included in the City's list of available
sites for the preliminary injunction hearing, ECF No. 7-2 at 3 No. 41, but was not included on the
City's current list.  Accordingly, it is not included on the Court's list.

The City's current list includes W/S Shop Grove Drive (TMS #16202-03-01), W/S Shop Grove
Drive (TMS #16202-03-02), 105 Shop Grove Drive (TMS #16202-01-01), and 151 Shop Grove
Drive (TMS #16202-01-02), which are Site Nos. 43, 44, 45, and 46, respectively, on the Court's
list.  These sites are not discussed by McLaughlin in any of his filings.  In the City's current list,
it has an annotation next to these four sites that they are Site No. 32 (2716 Shop Road) on
McLaughlin's list, but this may not be accurate, as the TMS number for 2716 Shop Road is
16200-04-31, which does not match the TMS number for any of the four sites above.  The four
parcels, as well as the 2716 Shop Road property, are shown on Map 12 of Hampton's affidavit,

37.    400 Buckner Road.[23]

27.    700 Buckner Road.[24]

42.    710 Buckner Road.[25]

33.    730 Buckner Road.[26]

19.    131 Cort Road.[27]

25.    1464 Sunset Drive.[28]

24.    S/S Airline Drive.[29]

32.    1119 Airport Boulevard.[30]

7.    111 Atlas Court.[31]

14.    121 Atlas Court.[32]

39.    131 Atlas Court.[33]

---

ECF No. 64-2 at 18.

In any event, McLaughlin does not raise any issue regarding 2716 Shop Road that is distinct from any of the other parcels in this section, so it would be available for the reasons discussed below.

[23] Site No. 6 on McLaughlin's list.

[24] Site No. 7 on McLaughlin's list.

[25] Site No. 8 on McLaughlin's list.

[26] Site No. 9 on McLaughlin's list.

[27] Site No. 10 on McLaughlin's list.

[28] Site No. 14 on McLaughlin's list.

[29] Site No. 15 on McLaughlin's list.

[30] Site No. 16 on McLaughlin's list.

[31] Site No. 17 on McLaughlin's list.

[32] Site No. 18 on McLaughlin's list.

6.      121 Atlas Road.[34]

9.      1424 Atlas Road.[35]

5.      7607 Richard Street.[36]

8.      1320 Veterans Road.[37]

4.      2150 S. Beltline Boulevard.[38]

41.     2240 S. Beltline Boulevard.[39]

40.     2420 Shop Road.[40]

3.      121 Shop Road Extension.[41]

11.     2720 A Street.[42]

26.     2761 The Boulevard.[43]

28.     2771 The Boulevard.[44]

38.     NX 2781 The Boulevard.[45]

---

[33] Site No. 19 on McLaughlin's list.

[34] Site No. 20 on McLaughlin's list.

[35] Site No. 23 on McLaughlin's list.

[36] Site No. 25 on McLaughlin's list.

[37] Site No. 28 on McLaughlin's list.

[38] Site No. 29 on McLaughlin's list.

[39] Site No. 30 on McLaughlin's list.

[40] Site No. 31 on McLaughlin's list.

[41] Site No. 33 on McLaughlin's list.

[42] Site No. 34 on McLaughlin's list.

[43] Site No. 35 on McLaughlin's list.

[44] Site No. 36 on McLaughlin's list.

29.    2781 The Boulevard.[46]

12.    2791 The Boulevard.[47]

10.    1049 Second Avenue.[48]

31.    1021 Second Avenue.[49]

20.    1201 First Street South.[50]

McLaughlin Aff. ¶ 38. McLaughlin also stated that "the need for development approvals creates a discretionary review process that operates as a prior restraint on protected speech." *Id.* ¶ 35. He also said that "[t]hese areas also universally lack street lights and sidewalks, infrastructure improvements that are necessary to promote public safety, an alleged goal of the sexually oriented business ordinances."[51] *Id.* ¶ 36. Finally, he stated that all of the parcels with structures on them (he does not say which parcels have structures on them) and at least some of the vacant lots (he does not say which vacant lots) would require environmental assessments before they could be available to a sexually oriented business. *Id.* ¶ 37. Specifically, he said that Site No. 24 (S/S Airline Drive) and Site No. 32 (1119 Airport Boulevard) would require level 2

---

[45] Site No. 37 on McLaughlin's list.

[46] Site No. 38 on McLaughlin's list.

[47] Site No. 39 on McLaughlin's list.

[48] Site No. 40 on McLaughlin's list.

[49] Site No. 41 on McLaughlin's list.

[50] Site No. 42 on McLaughlin's list.

[51] However, in his deposition, he acknowledges that a sexually oriented business "would probably have no problem with the street lights, because that's a private utility and if you've got power service to your building, you could get them to put a handful of street lights in," and that there is nothing in the ordinances that requires sidewalks for sexually oriented businesses. McLaughlin Dep. 74:11–75:10.

environmental assessments due to potential hazardous waste on the sites.  McLaughlin Dep. 76:13–77:13.

In McLaughlin's deposition, he defined "relevant real estate market" ambiguously, stating that it is "[s]omething where . . . there's a reasonable expectation that a commercial building, commercial business could open and operate in a short period of time." *Id.* 9:23–10:3. He went on to state that such reasonable expectation "can range from things, but in an ideal world you'd have a shoe store, you would roll out the rack of shoes and you roll in a rack of adult material and you're done.  Obviously, it's not an ideal world, but that there wouldn't be impediments like construction permits, site improvement permits, tearing down part of an industrial building, hazardous wastes on the site, a number of criterion like that." *Id.* 10:4–14. He defined a short period of time as a range of one month if a minor remodel is needed to five or six months for a significant remodel.  *Id.* 24:7–25:1.  In his opinion, a site is unavailable if the sexually oriented business would have to obtain any construction permits, site improvement permits, or conduct any demolition, which meant that he would also deem any vacant lots to be unavailable.  *Id.* 11:10–13:3, 27:25–28:4, 78:18–20.  He believes that a site would be unavailable if a sexually oriented business had to obtain a construction permit because a building official could use the building code in a discretionary manner against the business.  *Id.* 23:25–24:6.  He also stated that a site would be unavailable if it had any hazardous waste that needed to be remediated.  *Id.* 13:11–15, 27:25–28:5.

The Court concludes that there is no genuine dispute as to any material fact regarding these twenty-eight parcels.  They may all be considered together because he does not distinguish between them in his affidavit or deposition, aside from the two parcels discussed above that may need level 2 environmental assessments.  Taboo agrees that these parcels are all in the correct

39

zoning district and are outside the distance buffers.  *See id.* 60:25–61:22, 77:20–23.  There is no dispute that at least some of these parcels are vacant and that at least two of them potentially have hazardous waste issues.  Taboo does not raise any other basis for excluding these parcels from the list of available sites.  Given that there is no dispute as to any material fact regarding these sites, the question of whether or not they are legally available may be resolved by this Court at summary judgment.

McLaughlin's reasons for excluding these parcels from the list of available sites are constitutionally irrelevant.  He excluded any vacant parcels, even though it is well-established that vacant parcels are constitutionally available.[52]  *See, e.g.*, *Renton*, 475 U.S. at 53–54; *McDoogal's E., Inc. v. County Comm'rs of Caroline County*, 341 F. App'x 918, 930 (4th Cir. 2009); *Allno Enters.*, 10 F. App'x at 202; *David Vincent*, 200 F.3d at 1334.  He expressed concerns about hazardous waste and environmental assessments on at least two of the sites, but this is also not a constitutional concern.  *See Allno Enters.*, 10 F. App'x at 202 ("Examples of impediments to the relocation of an adult business that may not be of constitutional magnitude include . . . having to clean up waste . . . ." (quoting *David Vincent*, 200 F.3d at 1334)).  His concerns about permitting fare no better, as Taboo does not receive special protection from generally applicable regulations simply because it is engaged in constitutionally protected speech.  *See Acara v. Cloud Books, Inc.*, 478 U.S. 697, 705–07 (1986); *David Vincent*, 200 F.3d at 1335.  Because McLaughlin has not raised any constitutionally-relevant concerns about these

---

[52] He even acknowledged as much in his deposition:

> Q:    Okay.  You disagree with [*Renton*] and counting vacant land, but you recognize that it does that?
>
> A:    Correct, that's a good way of putting it.

*Id.* 79:12–14, 156.

twenty-eight parcels, the Court concludes that, based on the evidence of record, they are available for use by a sexually oriented business.

### vi.    Other parcels

The following six parcels were not addressed by McLaughlin in his affidavit or deposition:

2.    161 Winhill Drive.

34.    1416 Atlas Road.

43.    W/S Shop Grove Drive.

44.    W/S Shop Grove Drive.

45.    105 Shop Grove Drive.

46.    151 Shop Grove Drive.

There is no genuine dispute as to any material fact regarding these parcels because the City has asserted, through Hampton, that the sites are all available under the ordinances, and Taboo has not submitted anything to the contrary.  Given that there is no dispute as to any material fact regarding these sites, the question of whether or not they are legally available may be resolved by this Court at summary judgment.  Because it is undisputed that these parcels comply with the ordinances, the Court concludes that, based on the evidence of record, these six parcels are available for use by a sexually oriented business.[53]

---

[53] This Court has carefully considered McLaughlin's site analysis.  Other courts have also considered but have not been persuaded by McLaughlin's available site analysis.  *See, e.g.*, *Bigg Wolf Discount Video Movie Sales, Inc. v. Montgomery County*, 256 F. Supp. 2d 385, 397–98 (D. Md. 2003); *Hickerson v. City of New York*, 997 F. Supp. 418, 421–22 (S.D.N.Y. 1998), *aff'd*, 146 F.3d 99 (2d Cir. 1998); *David Vincent, Inc. v. Broward County*, No. 97-7164-CIV, 1998 WL 35156026, at *4 (S.D. Fla. Feb. 3, 1998), *aff'd*, 200 F.3d 1325 (11th Cir. 2000).

c.    *Sufficiency of available parcels*

Based on the analysis set forth above, the Court has concluded that there are forty-six sites available in the City for a sexually oriented business to locate.  Taboo is the only sexually oriented business currently operating in the City, and there is no evidence that any other sexually oriented business is seeking to operate in the City.  *See* McLaughlin Dep. 48:25–49:4.

The Constitution does not mandate a minimum percentage of land that must be available to sexually oriented businesses.  *Allno Enters.*, 10 F. App'x at 201 (citing *N. Ave. Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 445 (7th Cir.1996)).  Thus, the appropriate consideration is whether there are a constitutionally sufficient number of sites available to a sexually oriented business.  *Id.*  There must be at least one available site, but it is not clear how many more than that are necessary.  *See McDoogal's E.*, 341 F. App'x at 930 (concluding that the availability of "multiple [at least twelve]" sites was sufficient); *Allno Enters.*, 10 F. App'x at 203 (concluding that at least eleven sites for three existing businesses was sufficient); *Woodall v. City of El Paso*, 49 F.3d 1120, 1127 (5th Cir. 1995) ("[A]s a matter of arithmetic, there were at all relevant times more 'reasonable' sites available than businesses with demands for them.  The Ordinances therefore afforded the Adult Businesses adequate alternative means of communication."); *Bigg Wolf*, 256 F. Supp. 2d at 397–98 (concluding that at least seven sites for six existing businesses was sufficient).

Based on this authority, the availability of forty-six sites for one existing business easily meets this constitutional standard.  Furthermore, even if the Court's conclusion that exactly forty-six sites are available is incorrect, there is no question that numerous sites are available. Taboo has simply not provided a factual basis to conclude that *all* of the sites that the City asserts are available are, in fact, not available.  The record is clear that there are multiple sites where

42

Taboo could relocate. Accordingly, there being no issue of fact that alternative sites to which Taboo could relocate are available, the Court concludes that the ordinances have not unreasonably limited alternative avenues of communication.

For the reasons discussed above, the ordinances are treated as content-neutral time, place, and manner regulations; are designed to serve a substantial government interest; are narrowly tailored to achieve that interest; and have not unreasonably limited alternative avenues of communication. Accordingly, the Court concludes that the ordinances do not violate the First Amendment.

### D.    Other arguments

Taboo has also raised other bases for relief that the Court will now address.

### 1.    *Prior restraint*

Taboo has asserted that the ordinances act as a prior restraint in violation of the First Amendment. A licensing ordinance for sexually oriented businesses is not an unconstitutional prior restraint as long as it (1) avoids unbridled discretion in the licensing decision maker; (2) places limits on the time within which the decision maker must issue the license; and (3) provides for prompt judicial review of an adverse decision. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225–28 (1990).

The City's ordinances meet that standard. The City may deny a license based only on "reasonably objective, nondiscretionary criteria unrelated to the content of the expressive materials," *Z.J. Gifts*, 541 U.S. at 783, including whether the applicant is underage, has

submitted false information, or has been convicted of certain crimes within the past five years, *see* Columbia, S.C., Code § 11-605(a).   Thus, the ordinances present no concern of unbridled discretion.   The ordinances also place limits on the time within which the decision maker must act on an application by requiring the license to be issued or denied within 20 days after application.   *Id.*   Finally, the ordinances provide for prompt judicial review by providing that, if the applicant appeals to a hearing officer and the hearing officer denies the license, the applicant may appeal the decision to a court of competent decision and that the hearing officer's decision does not become effective until the 30th day after it is rendered.   *Id.* § 11-610(a).   Furthermore, the ordinances provide that if any court action is initiated to appeal, challenge, restrain, or otherwise enjoin the City's enforcement of any license denial, suspension, or revocation, the City is required to issue the applicant a provisional license that allows the applicant to operate until the court issues a judgment on the matter.   *Id.* § 11-610(b).   For these reasons, the Court concludes that the City's ordinances do not operate as unconstitutional prior restraints.

### 2.   *Equal protection and due process*

Taboo also raises Fifth and Fourteenth Amendment equal protection and due process arguments.   However, because Taboo is not entitled to relief under the First Amendment, it cannot prevail on its due process and equal protection arguments.   *See Renton*, 475 U.S. at 55 n.4 (holding that because the ordinance complied with the First Amendment, the respondents "can fare no better under the Equal Protection Clause"); *Deja Vu-Everett-Federal Way, Inc. v. City of Federal Way*, 46 F. App'x 409, 411 (9th Cir. 2002) (holding that because the city's sexually oriented business regulations complied with the First Amendment, they were not irrational or arbitrary action in violation of substantive due process).

44

### 3.    *Ex post facto*

Taboo claims that the ordinances are barred as *ex post facto* laws because the amortization time began running before the City identified sites where Taboo could relocate. The Court disagrees.

There are four types of *ex post facto* laws:  (1) "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action"; (2) "[e]very law that aggravates a crime, or makes it greater than it was, when committed"; (3) "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed"; and (4) "[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender."  *Calder v. Bull*, 3 U.S. 386, 390 (1798) (emphasis omitted); *see also Carmell v. Texas*, 529 U.S. 513, 522 (2000) (following *Calder*).

None of these circumstances apply to the City's ordinances.  The ordinances do not punish action that was taken prior to passage of the ordinances, which is the essence of an *ex post facto* law.  Rather, the ordinances restrict and penalize action that takes place after the passage of the ordinances (and after the amortization period has run).  Taboo's initial opening and operation was not a violation because it complied with the then-existing ordinances.  It is Taboo's *continued* operation at its present location that runs afoul of the current ordinances.  The timing of the running of the amortization period relative to the time when the City produced a list of available sites is irrelevant to the question of whether the ordinances are barred as *ex post*

*facto* laws.[54]  Because the ordinances do not punish action that was taken prior to the enactment of the ordinances, the Court concludes that there is no *ex post facto* violation.

### 4.    *State law violations and bill of attainder*

Taboo also raises arguments in its summary judgment briefings that the restriction in the ordinance on granting variances is contrary to state law and is an unconstitutional bill of attainder.  *See* ECF No. 38-1 at 34–35.  These claims were not presented in the Complaint,[55] and Taboo cannot raise these claims for the first time in its summary judgment briefing.  *See, e.g.*, *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (holding that a party may not expand its claims to assert new theories in response to a motion for summary judgment); *White v. Roche Biomedical Labs., Inc.*, 807 F.Supp. 1212, 1216 (D.S.C. 1992) ("[A] party is generally not permitted to raise a new claim in response to a motion for summary judgment.").

## IV.    Other Motions

Also before the Court are Taboo's Motion to Compel, ECF No. 66; the City's Motion to Strike, ECF No. 71; Taboo's Motion to File Out of Time, ECF No. 73; Taboo's Motion for

---

[54] In fact, the only reason that the City needed to produce a list of available sites was to support its argument in this lawsuit that it did not unreasonably limit alternative avenues of communication.  Had Taboo not filed this lawsuit, the City would have had no greater obligation to produce a list of available sites for Taboo than it would for any other business seeking to locate in a permissible location.

[55] Taboo's motion to amend the Complaint to assert violations of the South Carolina Freedom of Information Act and the City's procedural ordinances was denied.  ECF No. 57.

Status Conference, ECF No. 55; and the City's Motion for Stay of Deadlines and Entry of Scheduling Orders, ECF No. 26. For the reasons discussed below, the Motion to Compel, Motion to Strike, Motion for Status Conference, and Motion for Stay are denied, and the Motion to File Out of Time is granted in part and denied in part.

### A.    Motion to Compel

In the Motion to Compel, Taboo asks the Court to direct the City to respond to two of its requests for production, which seek all City Council members' written communications for November and December 2011 and all Planning and Zoning Department's written communications for November 2011 through January 2012. *See* ECF No. 66-1 at 4. The City submitted a response in opposition, arguing that the motion should be denied as untimely, as overbroad and unduly burdensome, and as irrelevant because they are directed towards untenable claims. *See* ECF No. 70.

Local Civil Rule 37.01(A) provides that motions to compel must be filed within 21 days after receipt of the discovery response to which the motion is directed. Here, the City's responses to Taboo's discovery requests were served on September 16, 2014. ECF No. 70-1 at 5. Thus, after adding three days pursuant to Rule 6(d) of the Federal Rules of Civil Procedure, Taboo was required to file its motion to compel by October 10, 2014. However, Taboo did not file its motion until November 3, 2014. "[A] district court has discretion to consider an untimely motion to compel if the movant offers an acceptable explanation for the motion's tardiness," *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002) (citation omitted), but here, Taboo has not offered any explanation for the motion's tardiness, other than a vague reference to a "crush of work." ECF No. 73-1 at 1. Accordingly,

because Taboo's motion was untimely and it has not offered an acceptable explanation for its tardiness, the motion is denied. *See, e.g.*, *Kelly v. Equifax, Inc.*, No. 8:12-cv-3095-MGL, 2013 WL 5954799, at *3 (D.S.C. Nov. 7, 2013); *Brown v. Doe*, No. 4:12-cv-927-TLW-TER, 2013 WL 2490786, at *2 (D.S.C. June 10, 2013).

Additionally, even if the motion had been timely filed, it still would have been denied because Taboo's requests for production were overbroad for the reasons noted by the City. ECF No. 70 at 2; ECF No. 77 at 2, ¶ 6.

### B.    Motion to Strike and Motion to File Out of Time

In the City's Motion to Strike, it asks the Court to strike Taboo's reply brief and related exhibits, ECF No. 68, because (1) Taboo did not timely file it (Taboo filed it two weeks beyond the deadline for a reply brief); (2) it exceeds the page limitation for a reply brief (the page limitation for a reply brief is 15 pages and Taboo's brief is 23 pages); (3) it argues unpled claims and relies on late exhibits; and (4) it "contain[s] misstatements and *ad hominem* attacks." ECF No. 71. In response, Taboo filed its Motion to File Out of Time, in which it asks the Court to allow its reply brief, third declaration of its expert, and motion to compel to be filed out of time.[56] ECF No. 73. The City then filed a response, ECF No. 77, and Taboo filed a reply, ECF No. 79.

Regarding Taboo's request to file out of time its Motion to Compel, that request is denied because, as noted above, even if the motion to compel had been timely filed, it would have been

---

[56] It also requests an order extending the scheduling order and renews its request for a status conference. The Court will discuss these issues when addressing Taboo's Motion for Status Conference.

denied on the merits.

Regarding Taboo's requests to file out of time its reply brief, ECF No. 68, and third declaration of its expert, ECF No. 72, those requests are granted. In evaluating the parties' summary judgment motions, the Court has considered these filings and given them the weight to which they are entitled.

### C.    Motion for Status Conference and Motion for Stay

In Taboo's Motion for Status Conference, it asks the Court for a status conference to address the status of discovery and the scheduling order currently in place. In the City's Motion for Stay, it asks the Court for an order staying the entry of scheduling orders and all disclosure and conference requirements pending resolution of the summary judgment motions. The record reflects that, aside from the issues raised in Taboo's Motion to Compel, the parties were able to work out most discovery issues on their own, and significant discovery was conducted. There were voluminous filings in this case that indicate that the parties have exchanged written discovery and taken depositions. Additionally, the parties fully briefed their respective motions for summary judgment and submitted voluminous evidence in connection with these motions. In light of the discovery conducted and the Court's decision on the parties' summary judgment motions, the Motion for Status Conference and Motion for Stay are denied as moot.

## V.    Conclusion

The Court has carefully considered the parties' summary judgment motions, giving them individual consideration and construing the evidence in the light most favorable to the non-

moving party pursuant to the standard of review set forth above.  For the reasons stated, the City's Motion for Summary Judgment, ECF No. 25, is **GRANTED**, and Taboo's Motion for Summary Judgment, ECF No. 38, is **DENIED**.  Additionally, Taboo's Motion to Compel, ECF No. 66; the City's Motion to Strike, ECF No. 71; Taboo's Motion for Status Conference, ECF No. 55; and the City's Motion for Stay of Deadlines and Entry of Scheduling Orders, ECF No. 26, are **DENIED**; and the Motion to File Out of Time, ECF No. 73, is **GRANTED IN PART AND DENIED IN PART**.  This action is hereby **DISMISSED**.

      **IT IS SO ORDERED**.

                      *s/ Terry L. Wooten*
                      Terry L. Wooten
                      Chief United States District Judge

March 31, 2015
Columbia, South Carolina